**JORDAN, Superintendent of Insurance, v. AMERICAN EAGLE FIRE INS. CO. et al.**

**No. 9507.**

United States Court of Appeals
District of Columbia.
Argued Oct. 15, 1947.
Decided April 12, 1948.

Mr. Lloyd B. Harrison, Special Assistant Corporation Counsel, District of Columbia, of Washington, D. C., with whom Mr. Vernon E. West, Corporation Counsel, Mr. Chester H. Gray, Principal Assistant Corporation Counsel, and Mr. Oliver Gasch, Assistant Corporation Counsel, District of Columbia, all of Washington, D. C., were on the brief, for appellant.

Mr. Abraham Kaplan, of New York City, pro hac vice, by special leave of court, with whom Messrs. Paul B. Cromelin, and Francis C. Brooke, both of Washington, D. C., and George I. Gross, of New York City, were on the brief, for appellees.

Before EDGERTON, Associate Justice, MARIS, Circuit Judge, and PRETTYMAN, Associate Justice.

PRETTYMAN, Associate Justice.

This is an appeal from a judgment of the District Court setting aside an order of the Superintendent of Insurance for the District of Columbia and permanently enjoining its enforcement.[1] Appellees are 173[2] fire insurance companies engaged in business in the District of Columbia.

The controversy revolves about Section 3 of an act of Congress of June 1, 1944,[3] called the Rating Act, the pertinent provisions of which[4] are:

"The Superintendent is empowered to investigate the necessity for an adjustment of the rates on any or all risks or classes of risks within the scope of this chapter, and to order an adjustment of such rates whenever he determines, after investigation of the experience showing premiums and losses for a period of not less than five years next preceding such investigation, that the rates for any one or more classes of risks are excessive, inadequate, or unreasonable. In determining the necessity for an adjustment of rates, the Superintendent shall give consideration to all factors reasonably attributable to the risks, to the conflagration or catastrophe hazard, both within and without the District, and to a reasonable profit. * * *

"Any person, firm, or corporation aggrieved by any order, ruling, proceeding, or action of the Superintendent * * * may appeal to the Commissioners of the District, or contest the validity of such order, ruling, proceeding, or action in any court of competent jurisdiction by appeal or through any other appropriate proceedings, as provided under sections 35—1348 and 35—1349 [of the D.C.Code]."[5]

On February 1, 1945, the Superintendent requested that all companies to which the foregoing statute applied, furnish, "Pursuant to Sections 3 and 7",[6] "reports of your Company's experience in the District of Columbia for the five-year period

---

[1] American Eagle Fire Ins. Co. v. Jordan, D.C., 1946, 67 F.Supp. 76.

[2] 234 companies were subject to the order. The 173 appellees were the plaintiffs below.

[3] 58 Stat. 267 (1944), D.C.Code, tit. 35, §§ 1401–1409 (Supp. V), hereinafter sometimes referred to as the Act.

[4] 58 Stat. 267 (1944), D.C.Code § 35—1403 (Supp. V).

[5] The sections of the Code (35—1348 and 35—1349) referred to deal with appeals to the Commissioners of the District of Columbia and with proceedings in court. The former section provides for appeals in writing to the Commissioners, and for hearings before them, either orally or in writing, and says that evidence need not be taken on the appeal. The latter section provides that any person "affected" by an order of the Superintendent may contest "the validity" of the order in the courts "by appeal or through any other appropriate proceedings."

[6] The latter of these sections authorized and empowered the Superintendent "to

ending December 31, 1944." The reports, made under oath, were submitted as requested and were checked and recapitulated by the Superintendent. On August 10, 1945, a copy of the recapitulation was furnished to the companies through their Rating Bureau.[7] The Superintendent's subsequent invitation that the companies recommend a formula for the adjustment of their rates was declined. Thereafter, on October 29, 1945, the Superintendent notified the companies, in a multiple-addressee letter, that he had "given consideration to the information supplied by the experience reports and to all other factors reasonably attributable to the risks involved, including the conflagration and catastrophe hazard, both within and without the District, and to a reasonable profit", and had therefrom "determined that during the period 1940 to 1944, inclusive, the rates for fire and lightning insurance and for extended coverage insurance were excessive and unreasonable." He, therefore, ordered a specific over-all reduction of those rates, which he expressed in a lump sum of $225,407[8] for the companies as a whole, to take effect on January 1, 1946.[9] We postpone for a moment an analysis of his order.

Appellees immediately requested the Superintendent to amend or rescind his order and applied to him for an oral hearing at which testimony could be presented with respect to various objections to the order. An oral hearing was granted and held, commencing December 14, 1945, and enforcement of the order was stayed. At this hearing the Superintendent announced that the proceeding was a matter of grace and not of right and was in no sense a statutory hearing. The companies were permitted to bring in witnesses of their choice, to adduce oral and documentary evidence, and to argue to the Superintendent. The latter declined to elaborate the basis for his proposed adjustment further than the explanation contained in the order itself, and produced no evidence to support his order. Subsequently, on February 1, 1946, and ex parte, he issued a further order, in which he reviewed his position in the light of the hearing and the contentions of the companies, and amended his original order, postponing its effective date to April 1, 1946, and decreased the amount of the reduction to a lump sum of $115,236.

The Superintendent's orders were based upon the figures and other information furnished by the companies and relating to their experience for the preceding five-year period. There is no dispute as to this underlying data. The dispute on the merits of the orders concerned the factors which the Superintendent used in compiling the rates which he would allow. In his order of October 29, 1945, he said he would allow a loading of 1½ per cent for the conflagration hazard in the calculation of fire insurance rates, and the same percentage in the computation for extended coverage insurance. He allowed an underwriting profit of 5 per cent. He recited that 73 of the 234 companies reporting (28.87 per cent of the total premiums), including many of the oldest and largest companies, had an average expense ratio

require every company to furnish statistical reports of premiums and losses in such form and according to such classifications as the Superintendent shall prescribe and any other information which the Superintendent may deem necessary for the administration of this chapter." 58 Stat. 269 (1944), D.C.Code § 35—1407 (Supp. V).

[7] The Rating Act provides that the insurance companies shall organize and be members of a rating bureau for the purpose of "administering rates". The rating bureau is governed by its members and is not subject "to the direction or control of any other bureau, association, corporation, company, individual, or group of individuals." 58 Stat. 268 (1944), D.C. Code § 35—1404 (Supp. V).

[8] The order also affirmed a tentative reduction in a lump sum of $217,000 which had been ordered January 29, 1945.

[9] The pertinent portion of the order is: "In view of the foregoing, it is ordered that effective January 1, 1946, the rates for fire and lightning insurance and the rates for extended coverage insurance be reduced by at least 5.8260% and 32.5060%, respectively, so as to effect an annual reduction of not less than $134,273 and $91,134, respectively; provided however that if prior to that date the Rating Bureau recommends varying reductions by classes of risks, which in the aggregate would produce the amounts of reduction herein ordered, consideration will be given to such proposals."

of 38.74 per cent and that in none of these companies did the ratio exceed 44 per cent. Therefore, he said, he found 43 per cent of premiums written to be a reasonable allowance for expenses. He included in investment profit an amount calculated as the income derived by the companies from the investment of unearned premium reserves. In the order of February 1, 1946, the Superintendent changed the allowable expense factor to 43.5 per cent in fire insurance rates and entirely eliminated his proposed adjustment of rates for extended coverage insurance. The new order thus related to fire and lightning insurance only.

The contentions made by the companies to the Superintendent were that he had erred in his computation of premiums earned, in fixing the expense factor, and in his computation of the income from the investment of unearned premium reserves.

Appellee companies entered no appeal to the Commissioners of the District but, choosing the alternate remedy, filed a bill in the District Court praying for interlocutory and permanent enjoinders of any enforcement of the order and for a judgment that the order as amended is of "no force and effect, because the same has not been based upon a determination after the investigation required by statute". Alternatively, appellees sought a hearing concerning certain alleged substantive defects, one of which was that the order was confiscatory and another "because the defendant Superintendent has failed to give proper consideration to the elements required by statute."

The District Court enjoined enforcement of the order pendente lite and, after a nonjury trial in which evidence was received, adjudged the order illegal and void and made the injunction permanent. The basis for its conclusion was that the hearing required by due process of law had not been afforded the companies. Its reasoning, stated in a careful opinion, was that since due process of law required a hearing of the quasi-judicial type, the word "investigation" in the statute must be construed as including such a hearing, in order to avoid a conclusion that the statute itself was unconstitutional. The Superintendent appealed.

Our first inquiry must concern the express requirements of the statute. Section 3 of the Act, as set forth above, requires an "investigation" before a determination, and a determination before the promulgation of a rate adjustment order. But the Act does not expressly provide for a "hearing". There is no reason to take the term "investigation" at other than its face value. A quasi-judicial hearing, at which opposing parties present their claims and evidence and have their controversies determined, is not an "investigation", and a requirement that there be an investigation carries with it no command that a quasi-judicial hearing be conducted.[10] This statute is not like those which contain legislative mandates for "hearings",[11] "due

[10] Opp Cotton Mills v. Administrator, 1941, 312 U.S. 126, 136, 152, 61 S.Ct. 524, 85 L.Ed. 624. Exhaustive and scholarly discussions of the subject, with references to many cases, will be found in "The Requirement of Opportunity to be Heard in the Administrative Process" by Davis, 51 Yale L.J. 1093 (1942), and in "Constitutional Implications of the Opp Cotton Mills Case with Respect to Procedure and Judicial Review in Administrative Rulemaking" by Fuchs, 27 Wash.U. L.Q. 1 (1941).

[11] National Labor Relations Board v. Donnelly Garment Co., 1947, 330 U.S. 219, 67 S.Ct. 756, 91 L.Ed. 854; Federal Power Commission v. Hope Natural Gas Co., 1944, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333; Carter v. Kubler, 1943, 320 U.S. 243, 64 S.Ct. 1, 88 L.Ed. 26; Federal Power Commission v. Natural Gas Pipeline Co., 1942, 315 U.S. 575,

62 S.Ct. 736, 86 L.Ed. 1037; Opp Cotton Mills v. Administrator, supra note 10, 312 U.S. 126, at pages 137, 153, 154, 61 S.Ct. 524, 85 L.Ed. 624; United States v. Rock Royal Co-op., 1939, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; Consolidated Edison Co. v. National Labor Relations Board, 1938, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381; R. R. Commission v. Pacific Gas & Electric Co., 1938, 302 U.S. 388, 58 S.Ct. 334, 82 L.Ed. 319; Anniston Mfg. Co. v. Davis, 1937, 301 U.S. 337, 57 S.Ct. 816, 81 L.Ed. 1143; Ohio Bell Tel. Co. v. Public Utilities Commission, 1937, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093; West Ohio Gas Co. v. Public Utilities Commission (No. 1), 1935, 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761; First Nat. Bank v. Board of Com-

hearings",[12] "formal hearings",[13] or "full hearings".[14] The judicial character of such statutory hearings is emphasized, and perhaps demanded, by statutory provisions for a "review" of the agency action in a court.[15] A "review" is not usually a trial de novo; the common understanding is that the reviewing tribunal will inspect the step-by-step functioning and determinations of the agency. Of necessity, in such case a record of the agency hearing is required. In most instances, the statutory provision is that the agency's findings of fact shall be conclusive if they are supported by substantial evidence in the record. The trial court aptly quoted Mr. Justice Cardozo[16] on this point: "To put the problem more concretely: how was it possible for the appellate court to review the law and the facts and intelligently decide that the findings of the Commission were supported by the evidence when the evidence that it approved was unknown and unknowable?" The statute before us in the present case contains no provision for findings of fact by the Superintendent or for "review" by a court of the proceeding before him. This statute contemplates and provides for a different course of proceeding from that provided in many other statutes.

That Congress did not intend to require a quasi-judicial hearing when it required an investigation in the statute now before us, is indicated by the language which it employed in other sections of the insurance laws, of which the Rating Act is a part.[17] Thus, Section 35—418 of the Code, empowering the Superintendent to examine insurance companies' books and officials, provides: "The superintendent shall grant a hearing to the company examined". Section 35—426 states that he may revoke an agent's license "if, after due investigation, notice and a hearing, * * * he determines that such license has been secured by fraud or misrepresentation". Section 35—1306 forbids his revocation of any company's certificate of authority "until he * * * has afforded the company an opportunity for a full hearing". Most significant is Section 35—1340, which provides:

---

missioners Weld County, 1924, 264 U. S. 450, 44 S.Ct. 385, 68 L.Ed. 784; Chicago Junction Case, 1924, 264 U.S. 258, 264, 44 S.Ct. 317, 68 L.Ed. 667; Monongahela Bridge Co. v. United States, 1910, 216 U.S. 177, 195, 30 S.Ct. 356, 54 L.Ed. 435, 443. And see Federal Communications Commission v. N. B. C., 1943, 319 U.S. 239, 246, 63 S.Ct. 1035, 87 L. Ed. 1374, and Mr. Justice Brandeis, concurring in part in Chastleton Corp. v. Sinclair, 1924, 264 U.S. 543, 549, 44 S.Ct. 405, 68 L.Ed. 841.

[12] American Employers' Ins. Co. v. Commissioner of Insurance, 1937, 298 Mass. 161, 10 N.E.2d 76.

[13] Vinson v. Washington Gas Light Co., 1944, 321 U.S. 489, 64 S.Ct. 731, 88 L. Ed. 883.

[14] Morgan v. United States, 1938, 304 U.S. 1, 19, 58 S.Ct. 773, 82 L.Ed. 1129; Morgan v. United States, 1936, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288; Acker v. United States, 1936, 298 U.S. 426, 56 S.Ct. 824, 80 L.Ed. 1257; St. Joseph Stock Yards Co. v. United States, 1936, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033; Florida v. United States, 1931, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291; Tagg Bros. & Moorhead v. United States, 1930, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524; Northern Pacific R. Co. v. Department of Public Works, 1925, 268 U.S. 39, 45 S.

Ct. 412, 69 L.Ed. 836; United States v. Abilene & So. Ry. Co., 1924, 265 U.S. 274, 44 S.Ct. 565, 68 L.Ed. 1016; Pacific Telephone & Telegraph Co. v. Kuykendall, 1924, 265 U.S. 196, 44 S.Ct. 553, 68 L.Ed. 975; New England Divisions Case (Akron, C. & Y. R. Co. v. United States), 1923, 261 U.S. 184, 43 S.Ct. 270, 67 L. Ed. 605; Wichita R. & Light Co. v. Public Utilities Commission, 1922, 260 U.S. 48, 43 S.Ct. 51, 67 L.Ed. 124; Louisville & Nashville R. R. Co. v. Finn., 1915, 235 U.S. 601, 35 S.Ct. 146, 59 L.Ed. 379; Interstate Commerce Commission v. Louisville & N. R. R. Co., 1913, 227 U.S. 88, 91, 33 S.Ct. 185, 57 L.Ed. 431, 433; Washington ex rel. Oregon R. & N. Co. v. Fairchild, 1912, 224 U.S. 510, 32 S.Ct. 535, 56 L.Ed. 863.

[15] Opp Cotton Mills v. Administrator, supra note 10, 312 U.S. 126, at page 154, 61 S.Ct. 524, 85 L.Ed. 624; West Ohio Gas Co. v. Public Utilities Commission (No. 1), 1935, 294 U.S. 63, 68, 69, 55 S. Ct. 316, 79 L.Ed. 761; Tagg Bros. & Moorhead v. United States, 1930, 280 U. S. 420, 443, 50 S.Ct. 220, 74 L.Ed. 524.

[16] Ohio Bell Tel. Co. v. Public Utilities Commission, 1937, 301 U.S. 292, 303, 57 S.Ct. 724, 730, 81 L.Ed. 1093.

[17] The laws occupy 14 chapters in Title 35 of the D.C.Code.

"The Superintendent may revoke, suspend, or refuse to renew the license of any policy-writing agent, soliciting agent, broker, or salaried company employee when and if, after *investigation,* it appears conclusively to the Superintendent that any license issued to such person was obtained by fraud or misrepresentation, * * *.

\* \* \* \* \* \*

"Before the superintendent shall revoke or suspend the license of any such person he shall give to such person an opportunity to be *fully heard,* and to introduce evidence in his behalf." [Italics supplied.]

In this last-quoted section Congress provided for an "investigation", and then, when it meant also to require a hearing, it said so.

Further, and finally, there is grave doubt that the Superintendent possesses the powers necessary to conduct a quasi-judicial hearing in these proceedings. The powers to administer oaths and to subpoena witnesses and documents in these cases are not expressly given him by the statute. Congress gave him the power to issue subpoenas in Section 35—412, but that grant was specifically limited to examinations of life insurance companies. The grants in Sections 35—418 and 35—506 of power to examine company officials under oath are likewise limited to life insurance companies. We do not say that the necessary powers will not be implied where a quasi-judicial hearing is clearly required, but their absence here is additional evidence that such a hearing was not intended by Congress. If we were compelled to read into this statute a requirement for a hearing before the Superintendent, we would also have to read into it the powers and requirements ancillary to such a hearing; including oaths, subpoenas, findings, conclusions, and a record of the proceeding.

Thus we conclude upon the first part of the problem that this statute did not require a quasi-judicial hearing by the Superintendent. It prescribed an investigative, or legislative, process only. The next question is whether a quasi-judicial hearing is required by the Constitution as part of a legislative, or investigative, process. We admonish caution in observing the proposition thus put. In the case before us, we are compelled first to determine the validity of the Superintendent's investigative process as such. The question is whether his order was invalid because of the procedure which he followed. We will come later to the requirements of due process upon the ultimate application of the order to the companies.

It is clear that the hearing afforded by the Superintendent was not valid as a quasi-judicial hearing. It lacked many of the essentials of such a hearing. It was, as counsel for the Superintendent carefully and clearly stated at the time, merely an opportunity for the companies to state and support their objections to the report and order already issued. It was not adversary in any sense. Neither the bases nor the processes of the Superintendent's order were explored, because they were not revealed except in the most summary fashion. The Superintendent submitted no evidence in support of his order and refused to be subjected to interrogation in that regard. But we do not think that the order was invalid merely because it was not preceded by a quasi-judicial hearing.

This question cannot be solved by attaching a label to the proceeding and placing it in a slot. Historically, and by nature, rate-making is a legislative process.[18] The hearings customary and sufficient in the legislative process are discussed by the Supreme Court in the opinions in St. Joseph Stockyards Co. v. United States,[19] and more particularly in Norwegian Nitrogen Products Co. v. United

---

[18] Keller v. Potomac Electric Power Co., 1923, 261 U.S. 428, 440, 43 S.Ct. 445, 67 L.Ed. 731; Prentis v. Atlantic Coast Line Co., 1908, 211 U.S. 210, 226, 29 S. Ct. 67, 53 L.Ed. 150, 158, 159; Chicago Junction Case, 1924, 264 U.S. 258, 263, 44 S.Ct. 317, 68 L.Ed. 667; Los Angeles Gas & Electric Corp., v. R. R. Commission, 1933, 289 U.S. 287, 304, 53 S.Ct. 637, 77 L.Ed. 1180; Colorado Interstate Gas Co. v. Federal Power Commission, 1945, 324 U.S. 581, 589, 65 S.Ct. 829, 89 L.Ed. 1206.

[19] 1936, 298 U.S. 38, 50–54, 56 S.Ct. 720, 80 L.Ed. 1033.

States.[20] Generally speaking, a hearing is not a necessary part of the legislative process. But we need not decide that question in the present case, because, even assuming that the statutory requirement that there be an "investigation" could not be satisfied in the absence of any hearing whatsoever, such requirement, as an element of an "investigation", without more, was satisfied by the hearing granted in this case. But this conclusion does not solve our problem. The due process clause provides that no one shall be deprived of his property without due process of law; and the "due process" which must be accorded in enforcement of a reduction in rates includes a judicial type of hearing before a capable tribunal.[21] That clause applies regardless of the preceding legislative action.

The point of the matter, without an elaborate development of it, is that Congress could pass a law without any hearing at all, but a man's property could not be taken under that law until he had a full hearing, and even then his property could not be confiscated. In such case the law itself would not be invalid by reason of a procedural defect in that no hearing preceded its enactment. But the attempted taking of the property would be invalid if no opportunity for hearing was afforded.

We need not venture too far into generalization. Public regulation of rates and prices has occurred for numerous reasons and under several powers of government. Railroad rates have long been regulated under the interstate commerce power, prices of milk under the police power,[22] and in time of war prices generally have been controlled under the war power.[23] The procedure by which the requirements of due process have been met has varied, as the cases just cited show.[24] In respect to the public regulation of the rates of private concerns in peacetime, which is what we have here, the minimum requirements are clearly established.

It is unnecessary to repeat here the classic consideration of rate-making in Munn v. People of Illinois.[25] It was there pointed out that he who enters upon a business in which the whole public has a direct and positive interest, must contemplate that the regulation of that business may change from time to time. But to that concept the constitutional limitations of the due process clause must be added. Those limitations are both procedural and substantive. That the procedural necessities include the revelation of the evidence upon which the disputed order is based, an opportunity to explore that evidence, and a conclusion based upon reason and not merely arbitrary, is soundly established by a long line of cases.[26] In respect to substance, the Court has

---

[20] 1933, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796.

[21] Cases infra notes 26 and 29.

[22] Nebbia v. New York, 1934, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Borden's Farm Products Co. v. Baldwin, 1934, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281.

[23] Bowles v. Willingham, 1944, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892; Yakus v. United States, 1940, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834.

[24] Nebbia v. New York, supra note 22, in which legislative fixing of minimum rates was upheld, rested upon extensive findings of fact, made formally by a legislative committee which showed serious threats to the health and economic welfare of the people of the State. In Borden's Farm Products Co. v. Baldwin, supra note 22, the Court held that in the situation there presented findings of fact by the court, based upon evidence, were essential to the decision of the constitutional questions posed by the statute itself. In Yakus v. United States, supra note 23, and in Bowles v. Willingham, supra note 23, the Court was careful to point out that the statutes in question provided for judicial review of the Administrator's orders, and this, the Court said, satisfies the requirements of due process. The Court also emphasized that the necessities for the legislation were the extreme circumstances of war.

[25] 1877, 94 U.S. 113, 24 L.Ed. 77.

[26] Included in the line are: Chicago, M. & St. P. Ry. Co. v. Minnesota, 1890, 134 U.S. 418, 10 S.Ct. 462, 702, 33 L.Ed. 970; Interstate Commerce Commission v. Louisville & N. R. R. Co., 1913, 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431; Southern Ry. Co. v. Virginia, 1933, 290 U.S. 190, 54 S.Ct. 148, 78 L.Ed. 260; West Ohio Gas Co. v. Public Utilities Commission, 1935, 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761; Ohio Bell Tel. Co. v. Public Utilities Commission, 1937, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093; Carter v. Kubler, 1943, 320 U.S. 243, 64 S.Ct. 1, 88 L.Ed.

lately redefined the essentials necessary to the investor interest in rates.[27] They are that there be enough revenue for operating expenses, capital costs, and sufficient return to the equity owner to assure financial integrity of the enterprise, so as to maintain its credit and to attract capital.[28]

It is also established that where the requisite due process hearing is not included in the legislative or administrative process, it may be adequately supplied by a judicial proceeding in which new evidence may be supplied and full opportunity afforded for exploration of the bases of the disputed order.[29]

At this point our inquiry is delimited by the statute here involved. This statute directs the Superintendent, as the legislative agent, to adjust rates only after finding existing rates to be excessive, inadequate or unreasonable. That requirement injects a justiciable issue into the proceeding. Then the statute provides, as above quoted, that any person "aggrieved" [30] may "contest the validity of such order * * * in any court of competent jurisdiction by appeal or through any other appropriate proceedings". A civil action for an injunction is an appropriate proceeding. And the clause "contest the validity" means to test validity in any or every respect in which the order might be invalid. That includes the right to explore the evidence upon which the Superintendent acted, and the reasons and calculations upon which he reached his conclusions. If there were no substantial evidence, or

if his conclusion was purely arbitrary, i. e., not to be reached by any reasonable process of consideration, it would be invalid. The right to "contest" includes the right to present evidence. If the order is confiscatory, it would be invalid. Moreover, the statute prescribes certain conditions to the validity of the Superintendent's order. As we have just said, he must find that existing rates are "excessive, inadequate, or unreasonable". He must "give consideration to all factors reasonably attributable to the risks, to the conflagration or catastrophe hazard, both within and without the District, and to a reasonable profit." His findings in those respects can be tested.

The District Court was of opinion that the Superintendent's order was invalid for procedural defects, in that the procedure before him failed to include a hearing which met the requirements of due process. It was led to that conclusion by its view of the decisions in Ohio Bell Tel. Co. v. Public Utilities Commission,[31] R. R. Commission of California v. Pacific Gas & Electric Co.,[32] Interstate Commerce Commission v. Louisville & N. R. R. Co.,[33] United States v. Illinois Central R. R. Co.,[34] and Clarksburg-Columbus Short Route Bridge Co. v. Woodring.[35] The cases upon the subject are legion, but a study of those just mentioned indicates the conclusion of the case at bar. We need not analyze each case. They and the authorities they cite establish the propositions we now state. Rate-making procedures differ. Some-

---

26; see also Market Street Ry. Co., v. Railroad Commission, 1945, 324 U.S. 548, 559–562, 65 S.Ct. 770, 89 L.Ed. 1171.

27 Federal Power Commission v. Hope Natural Gas Co., 1944, 320 U.S. 591, 64 S. Ct. 281, 88 L.Ed. 333.

28 Whether in the present case this minimum is applicable to the companies separately, as such, or is applicable to the several classes of risks, as such, and thus to the companies as a group, is a question we discuss later.

29 Porter v. Investors Syndicate, 1932, 286 U.S. 461, 52 S.Ct. 617, 76 L.Ed. 1226; Wadley So. Ry. Co. v. Georgia, 1915, 235 U.S. 651, 661, 35 S.Ct. 214, 59 L.Ed. 405, 411, and cases cited. See Mr. Justice Brandeis, dissenting in Ohio Valley Water Co. v. Ben Avon Borough, 1920, 253 U.S. 287, 292, 40 S.Ct. 527, 64 L.Ed. 908, 915;

and Mr. Chief Justice Hughes, Mr. Justice Stone and Mr. Justice Cardozo, dissenting in Southern Ry. Co. v. Virginia, 1933, 290 U.S. 190, 199, 54 S.Ct. 148, 78 L.Ed. 260. See also reference in Ohio Bell Tel. Co. v. Public Utilities Commission, 1937, 301 U.S. 292, 303, 57 S.Ct. 724, 81 L.Ed. 1093.

30 The section of the Code incorporated by reference says "affected".

31 1937, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093.

32 1938, 302 U.S. 388, 58 S.Ct. 334, 82 L.Ed. 319.

33 1913, 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431.

34 1934, 291 U.S. 457, 54 S.Ct. 471, 78 L.Ed. 909.

35 1937, 67 App.D.C. 44, 89 F.2d 788.

times they are state or local tasks and sometimes federal tasks, and the functions of particular courts differ according to the place of the court in the procedure involved. Thus, if a local rate is fixed by state authority, the function of a federal court is to determine constitutional questions only; in such case, no hearing in the federal court can supply the lack of a hearing in the state process. But, on the other hand, the state legislature may prescribe a procedure in which the initial order is upon legislative or wholly administrative consideration and the full hearing is afforded in a court action. If the court proceeding includes the full right to present evidence, to meet issues, and to explore the evidence and conclusions of the legislative or administrative agent, due process of law exists. In such case, a federal court cannot invalidate the final rate order because no hearing was afforded in the administrative or legislative part of the proceeding. However, if the state procedure consists of administrative consideration without hearing, and court consideration merely by way of review of the determination below without new evidence or exploration by cross-examination, a federal court will set aside the final order as without due process. In modern times, most states, like the federal government, provide for a full hearing in the course of the administrative consideration, thus making that proceeding quasi-judicial. In such instances the addition of a judicial review of the record, findings and conclusions made below, constitutes a combination of actions which satisfies the requirements of due process.

■■■ The keys to our conclusion in the case at bar are two. In the first place, the function of the District Court in this matter is not that of a federal court acting upon a state-made order, but is one of the other functions which it possesses as the local court of general jurisdiction in the District of Columbia. In this latter capacity it acts as though it were a state court. Thus, the Congressional plan for the determination of local rates can include the District Court as part of the procedure, just as state legislatures can include court consideration as part of the local procedure in rate-making. Before the public utilities appeal act for the District of Columbia was enacted in 1935,[36] public utility rates were fixed by the court in a complete de novo trial.[37] It is not incumbent upon the court to fix insurance rates under the statute here involved, but reference to the old procedure indicates the nature of the present proceeding.

■■■ The provision in this statute relating to the court is the second key to our conclusion. As we have pointed out, that provision seems to us to mean a complete right to a full hearing de novo, upon which the court will determine the validity of the order in all respects in which it is contested; except that we hold, as indicated, that the mere lack of a quasi-judicial hearing before the Superintendent is not fatal. Because of the clear provision in the statute for adequate and independent court examination of the proposed order, we are not faced with the alternative which the District Court felt that it faced; that is, either to read into the statute a requirement for a quasi-judicial hearing before the Superintendent and the necessary implementary powers for such a hearing, or else to declare void any order the Superintendent might make. In the Clarksburg-Columbus case, supra, this court obviously felt that it faced that alternative, and it solved the difficulty by taking the first choice. Whether the right to a complete new trial by an equity suit under the general powers of equity existed in the absence of any statutory right to court review, was not considered by us there, and we do not consider it here.

■■■ The District Court rightly held that in rate-making proceedings such as this, a full hearing in the judicial sense is required. We think it was in error in holding that that hearing must in all cases be afforded in the administrative or legislative process. As we see it, the modern custom of placing that hearing in that part of the procedure is a matter

---

[36] Act of Aug. 27, 1935, 49 Stat. 882, D.C.Code § 43—705 (1940).

[37] Keller v. Potomac Electric Power Co., 1923, 261 U.S. 428, 43 S.Ct. 445, 67 L.Ed. 731.

of desirability by reason of expertise, and not a matter of constitutional necessity.

 It follows that these appellees had a statutory right to file their bill in equity in a court; to seek therein an enjoinder of the enforcement of the rate-making order; and, as a necessary incident to this type of procedure, to have, upon proper preliminary showing, a stay, by way of interlocutory injunction, of the enforcement of the order pendente lite; to participate in a trial de novo on the issue of the validity of the order; and to have the court decide that issue. If these rights were satisfied, appellees can claim no procedural contravention of the due process clause.

Appellees did file their bill reciting and praying as we have indicated. Upon pre-trial hearing the court announced its intent to conduct a trial de novo, and we are not cited to any failure of the court to do so. So far as we now know, all admissible evidence offered was admitted and appellees were not unduly limited in this regard; they make no contention to us that the court erred in this respect.

 We now face a somewhat novel problem of procedure. In its well-considered opinion filed in this case, the District Court rightly held that appellees had the burden of proving their allegation that the order was confiscatory. In that opinion (note—"opinion"), the court said [67 F.Supp. 85]: "In the light of the foregoing considerations, the court reaches the conclusion that the plaintiffs [appellees] have not sustained their contention that the rates fixed by the Superintendent of Insurance are confiscatory." The court directed counsel to suggest findings of fact and conclusions of law in accordance with its opinion. The Superintendent proposed a conclusion of law which read: "The plaintiffs [companies] have not sustained their contention that the rates fixed by the Superintendent of Insurance are confiscatory." But this conclusion of law was not adopted by the court in its findings of fact, conclusions of law, or judgment. The court made no finding of fact regarding the issue of confiscation; its conclusions of law are equally silent on that question. The failure to enter the proposed conclusion was made the subject of two of the eight items of appellant's Statement of Points to be Argued on Appeal, as that document was filed in the District Court and as incorporated in his brief before us. However, he has devoted no portion of his written or oral argument to this omission but, instead, contends that the court below actually held that there was no showing of confiscation. He tells us that this issue is not a part of this appeal, since the appellee companies did not enter a cross-appeal from the holding. Appellees admit, perhaps even join the appellant in contending, that the issue of confiscation is not before us now, and say that no cross-appeal was taken in view of the grounds upon which the court's order was premised.[38]

It is our conclusion that the District Court has not yet determined the issue of confiscation; and it clearly did not dispose of the other phases of the issue of substantive validity of the Superintendent's order. Thus, the situation is that the question of confiscation was specifically raised by the pleadings below, a decision upon it was mentioned in the opinion of the court, but it was not determined by findings or conclusions; nevertheless, neither the decision indicated in the opinion nor the failure to determine the matter

---

[38] Appellees' explanation is strengthened by the disposition made below of other objections made by them. The court said: "The plaintiffs further contend that certain of the basic factors that necessarily enter into the fixing of rates, were computed by the Superintendent of Insurance on an erroneous and improper basis. In the light of the disposition about to be reached, it does not appear pertinent to pass on these objections at this time, since the order of the Superintendent will be set aside for failure to comply with the basic requirement of a fair and full hearing. At such a hearing, counsel for the Superintendent, as well as counsel for all interested parties will be in a position to offer evidence on these disputed issues, and for this reason, it seems best to not pre-judge them." Special findings need not be made of facts not necessary to the determination. Klimkiewicz v. Westminister Deposit & Trust Co., 1941, 74 App.D.C. 333, 334, 122 F.2d 957, 958, certiorari denied, 1942, 315 U.S. 805, 62 S.Ct. 633, 86 L.Ed. 1204.

formally, is presented to us by brief or argument. We have held the trial court to be in error in the view upon which it rested its judgment. We think that a proper disposition of the appeal is not simply to reverse upon that ground, but to remand the case so that a complete determination may be made of the other issues, even though failure to argue error upon that ground might seem to preclude us from so doing.

This disposition of the appeal makes advisable a discussion of one further point, although that discussion is not necessary to the present decision. The point will be involved in the District Court's further consideration of the case. The question of confiscation raised in respect to an order of the Superintendent under this statute, is a difficult one. The District Court indicated in its opinion that confiscation could be shown by individual companies and that, if thus shown individually, the order would be invalid as to those companies. Certainly the court had ample justification for its position in the three cases which it cited.[39] The Aetna Insurance Co. case[40] seems precisely in point on its facts and in the implication of the opinion. But we are not sure that that is the correct rule here. As we have indicated, we do not have the point before us on this appeal and so cannot decide it. But we call to the attention of the District Court the possibility that another rule may be applicable to this situation. The rate regulation here involved is not directed at a specific company or companies, as in the usual utility rate proceeding, but rather is directed at the risk. No monopoly is involved. The rates apply to all who do insurance business in the District of Columbia, and over 200 companies are now so engaged. The problem is discussed in Bowles v. Willingham,[41] although that case and some of the cases there cited concerned war powers only, or the exercise of the police power upon situations critical in the general economy.[42] The Court there said, "We need not determine what constitutional limits there are to price-fixing legislation." It may be that the District Court will have to deal with that problem of constitutional limits in the further proceedings in this case. The decision in Aetna Insurance Co. v. Hyde, supra, 275 U.S. 440, 48 S.Ct. 176, was that a claim of confiscation against an order fixing insurance rates generally, for all companies, could be made only by a company as to which the rates would necessarily deny just compensation, as shown by the facts of that particular company's operations. Clearly, as we have said, the implication is that the general order would be invalid as to companies which could make that showing. And it is also true that the Court said, in the course of its opinion, that "Rates sufficient to yield adequate returns to some may be confiscatory when applied to the business of others." But, at the same time, the Court said that "It has never been and cannot reasonably be held that state-made rates violate the Fourteenth Amendment merely because the aggregate collections are not sufficient to yield a reasonable profit or just compensation to all companies that happen to be engaged in the affected business." Thus, the opinion appears to hold that the rates fixed by general order may be generally valid but invalid as to those companies which can show such rates to be confiscatory as to them. Such a rule raises practical difficulties. The figures differ widely among the individual companies. The amounts of expense allocated to business in the District of Columbia by those companies doing a nation-wide busi-

---

[39] Missouri Rate Cases (Knott v. Chicago, Burlington & Quincy R. Co.), 1913, 230 U.S. 474, 33 S.Ct. 975, 57 L.Ed. 1571; Minnesota Rate Cases (Simpson v. Shepard), 1913, 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann. Cas.1916A, 18; Aetna Insurance Co. v. Hyde, 1928, 275 U.S. 440, 48 S.Ct. 174, 72 L.Ed. 357.

[40] Supra note 39.

[41] Supra [321 U.S. 503, 64 S.Ct. 649] note 23; see also Hegeman Farms Corp.

v. Baldwin, 1934, 293 U.S. 163, 168–172, 55 S.Ct. 7, 79 L.Ed. 259.

[42] Nebbia v. New York, supra note 22, and Sunshine Anthracite Coal Co. v. Adkins, 1940, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263, rested upon corrective police power, the established facts being that regulation of prices, in the one case minimum and in the other maximum, was necessary to the preservation of an important segment of the general economy, state or federal.

ness, are vital. Wholly fortuitous circumstances appear to govern some of the results as expressed in percentages of expense to premiums earned. For example, on oral argument counsel for appellant referred to one company for which the expenses were over 1,000 per cent of the premiums earned. But reference to the figures for that company shows that its only premium was $12.46, whereas its District franchise cost $56 and its share of the expense of the Rating Bureau, imposed by statute, was $70, which two items of expense ($126) were 1,000 per cent of its premium. A dilemma is posed by this practical aspect. If constitutional validity is to be determined by consideration of the several companies separately, the only valid uniform rate would be that fixed by the experience of the company with the highest expenses. Such surely is not the requirement of due process. The alternative requirement of that method of testing validity is a series of rates for the same risk, which in ultimate precision could be a separate rate for each company. The practical effect of a series of rates would necessarily be the establishment of the lowest responsible rate as the uniform rate, and the resulting financial squeeze would tend to a monopoly in a few companies. On the other hand, if constitutional validity can be tested by a reasonable figure fixed by the general experience of all, the public interest in reasonable rates, the public interest against monopoly, the companies' interest in reasonable return, and the incentive toward good management by the companies would all be well-served.

■ The power to regulate insurance rates is a police power.[43] Undoubtedly the constitutional limitations of due process of law, both procedural and substantive, apply. The problem posed by the present statute is whether the substantive requirement applies to the companies severally, as their individual figures may indicate, or whether it applies to the group as a whole upon a reasonable appraisal of the experience of all the companies. This extended comment upon a point which is not before us for decision, which has not been argued or briefed, and as to which we do not mean to indicate a firm opinion, is made in fairness to the parties and to the District Court, because that court indicated a view based, so far as appears, only upon the three cases it cited.

It is regrettable that so practical a matter in the everyday life of the community as fire insurance rate regulation should be so long in doubt due to judicial consideration, but the questions raised go deep into constitutional principles and involve a multitude of decided cases. The delay may be further extended because of our inability to decide, upon the record before us, the point last discussed. But we see no escape from it.

We hold that, so far as it appears to us, the trial court has not made a complete determination, and we, therefore, remand so that such a determination may be accorded these parties. The District Court, in its discretion, may complete the trial de novo by making the necessary findings and conclusions on the present record, or may reopen that trial at any point that it sees fit and proceed therefrom to a final determination.[44] We do not intend to indicate now whether or not any of the possible findings are supportable by the evidence of present record.

Reversed and remanded for further proceedings in accordance with this opinion.

EDGERTON, Associate Justice, concurs in the result.

[43] German Alliance Ins. Co. v. Lewis, 1914, 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011, L.R.A.1915C, 1189.

[44] Boss v. Hardee, 1937, 68 App.D.C. 75, 93 F.2d 234 (under Equity Rule 70½, 28 U.S.C.A. § 723 Appendix).