A. E. STALEY MFG. COMPANY et al.,
Plaintiffs,

v.

UNITED STATES of America and In-
terstate Commerce Commission,
Defendants,

and

Atchison, Topeka & Santa Fe Railway Co.,
et al., Intervening Defendants.

No. 4–69 Civ. 459.

United States District Court,
D. Minnesota,
Fourth Division.

Jan. 29, 1970.

Andrew P. Goldstein, Washington, D.
C., and James R. Scoggin, Glenview, Ill.,
for plaintiffs.

J. Earl Cudd, Asst. U. S. Atty., for defendant the United States.

Fritz R. Kahn, Deputy Gen. Counsel, I. C. C., for defendant Interstate Commerce Commission.

Stuart W. Rider, Jr., Minneapolis, Minn., for intervenors Atchison, Topeka & Santa Fe Rwy., Louisville & Nashville Ry. Co., St. Louis Southwestern Ry. Co., Seaboard Coast Line Ry. Co., Southern Ry. Co., Southern Pacific Transportation Co., Southern Freight Assn., and Traffic Executive Assn., Eastern Railroads.

James W. Nisbet, Chicago, Ill., for intervenor Western Railroad Assn.

Before HEANEY, Circuit Judge, and NORDBYE and LORD, District Judges.

## MEMORANDUM

### PER CURIAM.

The plaintiffs request this Court to issue a temporary injunction restraining the Interstate Commerce Commission from enforcing what the plaintiffs describe as an "order" of the Commission issued on October 20, 1969. The "order" as later interpreted obligated the plaintiffs as consignees of grain shipments to remove non-reusable paper grain doors from unloaded railroad cars. (See Appendix A) It also obligated the rail carriers to refuse to move cars from which the paper grain doors had not been removed by consignees or to charge consignees for the removal of the doors.

Affidavits and counter affidavits were filed by the parties. No oral testimony was presented to the Court. The affidavits, as explained and clarified by the parties at oral argument, show that: The plaintiffs receive shipments of grain at various elevators in the United States. The grain is shipped in ordinary box cars. The box cars are modified by installing temporary grain doors inside the permanent sliding doors so as to prevent leakage. The grain doors are made of wood or reinforced paper. The paper doors can ordinarily be substituted for the wooden ones at the carrier's option. The carrier has an obligation to furnish the doors and the shipper has an obligation to install them. Rules 14 and 27 (See Appendix B) are said to govern the consignees' obligation to unload rail cars. For at least twenty-five years, the railroads have removed the paper grain doors at their expense. This practice was known to the Commission. When the plaintiffs received the "order" of October 20, 1969, they caused immediate inquiry to be made as to whether it was to be construed so as to require consignees to remove the paper grain doors at their expense. Representatives of the Commission answered this question in the affirmative.[1] The railroads implemented the "order" rapidly. Consignees are now either paying for the removal of the paper doors or having them removed at their expense in 50% of the cases. The cost of removing the doors ranges from $5 to $10 per car.

The plaintiffs contend that the "order" was issued by the Commission without notice to the plaintiffs and with-

1. From the record it appears that the initial response from the Commission was made by Mr. R. D. Pfahler, Director of Bureau of Operations. In reply to inquiries by several plaintiffs as to whether the October 20, 1969 "notice" applied to the removal of grain doors, Mr. Pfahler stated that the "notice" requires consignees to remove non-reusable paper grain doors.

Subsequently several plaintiffs wrote letters to Mrs. Virginia Mae Brown, Chairman of the Commission, indicating that they felt that the notice, as interpreted by Mr. Pfahler, was contrary to established practice and requested a reconsideration of the Commission's posi-

tion. Mrs. Brown's response to such letters was that the "Press Release was issued as public notice of the Commission's broad view of the requirements of existing tariff rules." She indicated that she would take no action with respect to plaintiffs' request for a reconsideration of the Commission's notice.

Finally, a meeting was held on December 23, 1969, attended by representatives of several of the plaintiffs and representatives of the Commission, including Commissioner Murphy. The result of this meeting was that the Commission again took the position that it would not reconsider its action of October 20, 1969.

out giving them an opportunity to be heard with respect to it as required by Section 553 of the Administrative Procedure Act, Title 5 U.S.C. They argue that even though the "order" was entitled "Notice", and subsequently described as a "press release", it is, in fact, an "order" of the Commission which was an unwarranted interpretation of Rules 14 and 27 and has the effect of amending an established tariff which is reviewable by this Court under 28 U.S.C. § 1336. They further contend that the "order" deprives them of property without due process of law.

The Commission requests that the complaint be dismissed because this Court lacks jurisdiction over the subject matter and because the complaint fails to state a claim upon which relief can be granted. It, alternatively, opposes the motion for a preliminary injunction on the grounds that the right to equitable relief has not been shown. It specifically argues: (1) that the "press release" was not an order of the Commission and is not reviewable by this Court; (2) that the plaintiffs have not exhausted their administrative remedies; (3) that the plaintiffs have alternative means of testing the requirements sought to be enforced by the Commission; and (4) that the Commission's interpretation of Rules 14 and 27 is a reasonable one and is in the public interest.

The intervening defendants join in the motion for dismissal and in opposition to the plaintiffs' motion. They advance substantially the same arguments as the Commission, and additionally urge that the relief sought by the plaintiffs is inappropriate and that the plaintiffs will not be irreparably damaged if this Court refuses to grant the relief sought. They further urge that all shippers by rail will be harmed by the issuance of a restraining order.

■ On the basis of this record, we believe that the Commission's notice of October 20, 1969, was more than a "press release". It was, in effect, an order which by its interpretation effectively and substantially amended an existing tariff or promulgated a new one. Tariffs 14 and 27, which the Commission said it was interpreting, do not fix the responsibility for the removal of the paper grain doors on the consignees.[2] Although these tariffs have been in effect for many years, they have never been construed or interpreted to require consignees to remove the paper grain doors from box cars. Indeed, the railroads, with the knowledge of the Commission, have removed the paper grain doors at their expense for at least twenty-five years. While the cited tariffs require the "owner" (consignee) to remove the freight being shipped, the grain doors, whether wood or paper are not freight. They are furnished by the railroad and are considered a part of the box car which is owned by the railroad not the consignee.

The impact of the "order" is not inconsequential. The direct cost of removing paper grain doors from each box car is significant and the cumulative cost is great. Significant additional indirect costs will be incurred by consignees in holding and moving cars. Additionally, substantial changes in employment patterns may have to be developed.

The penalties for violating the "order", prosecution under the Elkins Act and Section 6(7) of the Interstate Commerce Act, are clearly spelled out in the "order" and are substantial.[3]

2. Tariffs 14 and 27 set forth in clear, unambiguous and nontechnical language the obligations of the carrier and shipper with respect to the loading and unloading of carload freight. This is not a case in which the words requiring construction are of a technical nature requiring a special expertise to determine their meaning. Nor is the interpretation placed upon these tariffs by the Commission controlling upon this Court, e. g., United States v. Great Northern Ry. Co., 337 F.2d 243, 248 (8 Cir. 1964).

3. The Commission made it perfectly clear in the "order" that it intended to enforce the interpretation ascribed to Rules 14 and 27. The means available for en-

As the notice was in fact an "order" of the Commission, which had the effect of amending an existing tariff and as it was issued without notice or hearing and without benefit of record or finding, it cannot be permitted to stand.[4]

■■ We are not persuaded by the defendants' argument that the plaintiffs must be denied relief because they failed to exhaust their administrative remedies before proceeding in this Court. They made inquiries of the Commission[5] which indicated that the Commission did not believe that the notice was one which was subject to review or reconsideration. Furthermore, we are not aware of any principle of law which requires that a party request an administrative agency to reconsider or review an action of the administrative agency which is issued in violation of the agency's rules, the Ad-

ministrative Procedures Act and without any semblance of a notice or hearing.

■ Nor are we persuaded that the plaintiffs were required to test the Commission's "order" by any of the alternatives suggested by the Commission. The plaintiffs need not, under the circumstances of this case, lay themselves open to numerous criminal prosecutions or bring numerous actions for damages against the railroads as a condition to seeking relief against this "order" of the Commission issued without notice or hearing.

On the basis of this record, we find no support for the Commission's view that its interpretation of Rules 14 and 27 is a reasonable one and in the public interest. This is not to say, however, that there is no evidence in the record to support the view that the public inter-

forcement are set forth in the Elkins Act, 49 U.S.C. § 41 et seq., and Section 6(7) of the Interstate Commerce Act. 49 U.S.C. § 41(1) provides in part:

"* * * Every person or corporation, whether carrier or shipper, who shall, knowingly, offer, grant, or give, or solicit, accept, or receive any such rebates, concession, or discrimination shall be punished by a fine of not less than $1,000 nor more than $20,000: *Provided*, That any person, or any officer or director of any corporation subject to the provisions of sections 41, 42 or 43 of this title, or of chapter 1 of this title, or any receiver, trustee, lessee, agent, or person acting for or employed by any such corporation, who shall be convicted as aforesaid, shall, in addition to the fine herein provided for, be liable to imprisonment in the penitentiary for a term of not exceeding two years, or both such fine and imprisonment, in the discretion of the court."

49 U.S.C. 41(3) provides for the recovery of any rebate that may be granted. It provides in substance that any company that receives a rebate shall, in addition to any penalty provided by sections 41, 42 or 43, forfeit to the United States a sum of money three times the value of any money or other consideration so received or accepted.

Section 6(7) of the Interstate Commerce Act prohibits departure from filed tariffs and the rendering of preferen-

tial services. The penalties for violation of any provision of the Act are specified in 49 U.S.C. § 10(1). This section provides that any person who violates the terms of the chapter, upon conviction thereof in any district court of the United States, is subject to a fine of not to exceed $5,000 for each offense; provided, however, that if the offense shall be an unlawful discrimination, such person shall be liable in addition to the $5,000 fine, to a term of imprisonment of not to exceed two years, or both.

4. We have found no provision in the Interstate Commerce Act, nor has the Commission cited to the Court any such provision, which empowers the Commission to amend existing tariffs on its own initiative without following the requirement of a full hearing with its attendant procedural safeguards as set forth in the Administrative Procedures Act. Of course, an order issued without the benefit of notice, a hearing and a record on which the order is based is void. See Interstate Commerce Commission v. Louis. & Nash. R. R., 227 U.S. 88, 91, 33 S.Ct. 185, 57 L.Ed. 431 (1913); Jordan v. American Eagle Fire Ins. Co., 83 U.S.App.D.C. 192, 169 F.2d 281 (1948); Lang Transp. Co. v. U. S., 75 F.Supp. 915, 924 (S.D.Cal.1948); Hoxsey Cancer Clinic v. Folsom, 155 F.Supp. 376, 378 (D.D.C.1957).

5. See *supra* Footnote No. 1.

est would be better served, primarily by increasing box car availability, if existing tariffs were modified or a new tariff adopted which would require the consignee to remove the paper grain doors, but that is not the issue before us.

We decide the motion submitted to us on the record before us. We recognize that the defendants should be permitted to present evidence to this Court on the hearing for a permanent injunction which may support the Commission's view that the October 20, 1969, "order" is a sustainable interpretation. We also realize that the Commission may feel that the need to shift the responsibility for removing paper grain doors is of such importance that it will initiate appropriate proceedings to modify existing tariff schedules or promulgate new ones. It is also possible that the railroads may initiate proceedings to accomplish the same end. And, finally, there is the possibility that the Commission may feel that, in the light of this opinion, it should conduct a full and a complete hearing to determine whether the October 20, 1969, "order" can be sustained as a proper interpretation of Rules 14 and 27. If the Commission so decides, there is nothing in this Order to prevent them from so doing and from making an appropriate motion when their hearings have been completed.

To permit the Commission and the defendants to pursue any of the alternatives outlined above, this Court will defer hearings on a permanent injunction for a period of thirty days, and will be receptive to receipt of an appropriate motion for further time if requested. But we are convinced that as the matter now stands, we must hold that the Commission's action was unlawful.

To summarize, we grant the plaintiffs' motion insofar as it relates to paper grain doors. An interlocutory injunction will be issued enjoining the defendants from enforcing, directly or indirectly, or by threat of criminal prosecution or otherwise, an "order" of the Commission issued on October 20, 1969, obligating the consignees of carload freight to remove non-reusable paper grain doors from unloaded railway cars and obligating or allowing rail carriers, subject to the Commission's jurisdiction, to either refuse to haul or move cars from which the non-reusable paper grain doors have not been removed or charging the consignees for the removal of such doors.

This opinion shall be in lieu of our findings of fact and conclusions of law. An appropriate interlocutory injunction shall be issued in accordance with this opinion.

It is so ordered.

### ORDER

Based upon the findings of fact and conclusions of law set forth in the foregoing memorandum,

It is ordered

That the Interstate Commerce Commission is enjoined, until further order of this Court, from enforcing, directly or indirectly, by threat of criminal prosecution or otherwise, an "order" of the Commission issued on October 20, 1969, and any other or related interpretations to Rules 14 and 27 of a tariff known as the Uniform Freight Classification, as (1) obligating consignees of carload shipments of grain to remove non-reusable paper grain doors from unloaded rail cars, and (2) obligating or allowing rail carriers subject to the Commission's jurisdiction to either refuse to haul or move cars from which non-reusable paper grain doors have not been removed by consignees, or from charging consignees for the removal of such doors.

### APPENDIX A

**INTERSTATE COMMERCE COMMISSION**

WASHINGTON, D. C. 20423

737–9765 Ext. 350

#305–69

FOR RELEASE:
Immediate
October 20, 1969

**ICC CAUTIONS CONSIGNEES AND RAILROADS ON CONSIGNEES'**

## OBLIGATION TO UNLOAD RAIL CARS IN COMPLIANCE WITH CARRIERS' PUBLISHED TARIFFS

The Interstate Commerce Commission by this notice cautions the public and carriers of consignees' duty to completely unload rail cars received loaded with goods that have moved in interstate commerce subject to carload rates and charges.

The Commission interprets Rules 14 and 27 of the Uniform Freight Classification to obligate consignees of carload freight to completely unload from such cars, at their expense, all dunnage, debris, or other foreign matter connected with the inbound shipment so as to return rail freight cars to the carrier in a condition for loading by another shipper without further unloading. The Commission reminds consignees that the attempted release as empty of a car which has not been completely unloaded or in which debris has been placed by a consignee is an unlawful solicitation of a trash removal privilege having the effect of a "concession, or discrimination" forbidden by the Elkins Act and Section 6 (7) of the Interstate Commerce Act.

The Commission expects all carriers by railroad subject to its jurisdiction to enforce Rules 14 and 27 of the Uniform Freight Classification to the extent that when a carrier becomes aware of the breach by a consignee of its duty to unload completely, the carrier is not to pull the car but to leave it at the consignee's tracks on demurrage or under special detention rules in accordance with applicable tariffs until the consignee has fulfilled its unloading obligation. Additionally, the Commission expects carriers, when they become aware that a consignee has put debris into a car released as empty, either to refuse the car and hold it on demurrage or under special detention rules, or to bill the consignee under applicable tariffs for the transporation of refuse.

The Commission has directed its investigative and enforcement staff to police this matter and to take such enforcement action as individual circumstances warrant, including, but not necessarily limited to, the institution of prosecutions under the Elkins Act against either the consignee or the carrier, or both.

The Commission expects every common carrier by railroad subject to its jurisdiction to effect broad notice of this Commission interpretation among their consignees, especially those that are known to have violated Rules 14 and 27 in the past.

### APPENDIX B

### RULE 14

Section 1. Carload ratings or rates apply only when a carload of freight is shipped from one station, in or on one car, except as otherwise provided in Rules 24, 29 or 34, in one calendar day from midnight to midnight, by one shipper for delivery to one consignee at one destination and is loaded by shipper and unloaded by consignee. Only one bill of lading from one loading point and one freight bill shall be issued for such CL shipment. The minimum CL weight provided is the lowest weight on which the CL rating or rate will apply.

Section 2. Carload ratings or rates also apply on carload shipments (as described in Section 1), which, under tariffs lawfully on file with the Interstate Commerce Commission (on interstate traffic) and State Commissions (on intrastate traffic) are accorded additional services or privileges described below:

(a) Loading by the carrier, under the provisions of the tariff, applicable at shipping station or stopover station.

(b) Unloading by the carrier, under the provisions of the tariff applicable at destination station or stopover station.

(c) "Split deliveries" (delivery to more than one party) at destination by the carrier, under provisions of the tariff applicable at destination station.

(d) Stopover privileges to complete loading or to partly unload while enroute under provisions of tariffs of carriers serving the stopover station.

(e) Transit privileges under the provisions of tariff permitting outbound shipments from the transit point to consist of portions of inbound carload shipments from one or more origins. On shipments accorded such transit privileges Section 1 of this rule will be considered as complied with if the carload shipment from the transit point complies with the provisions of Section 1 of this rule.

Section 3. When freight is loaded in or on a car by shipper and such car is not fully loaded but is tendered as a CL shipment, the shipment will be charged for as a carload.

## RULE 27

Section 1. Owners are required to load into or on cars, freight for forwarding by rail carriers, and to unload from cars freight received by rail carriers, carried at CL ratings or rates, except where tariff of carrier at point of origin or destination or stopover station (as the case may be) provides for loading or unloading of CL freight by carrier.

Section 2. Owners are required to load into or on cars, heavy or bulky freight for forwarding by rail carriers, and to unload from cars heavy or bulky freight received by rail carriers, carried at LCL or any quantity rates or ratings, which cannot be handled by regular station employes or, at stations where carrier's loading or unloading facilities are not sufficient for handling.

Section 3. It is the responsibility of both the initial, and intermediate shippers of cars which are to complete loading at more than one point, to observe carriers' rules regulating safe loading of freight and protection of equipment. Weight of lading must be approximately the same on each side of the car, and freight in closed cars, equipped with other than plug type doors, must be so loaded as to prevent any contact with car doors during transit. It is also the responsibility of the intermediate receiver of cars stopping to unload, to reload in a level manner or to brace or rebrace, if necessary to prevent damage, the remaining portion of the lading destined to the next receiver. The weight of load on one truck of car must not exceed approximately one-half of the load limit weight stencilled on car.

Section 4. When articles are loaded on open cars, small detachable parts must be removed and placed in barrels or boxes or secured within the article. Barrels and boxes must be encircled at ends with iron straps and securely attached to the article or to floor of car. Such barrels or boxes must be specified on shipping orders and bills of lading. Fragile parts not detached must be protected.