GODREAU, GODREAU & Co., ET AL., demandantes y apelantes, *v.* LA COMISIÓN DE SERVICIO PÚBLICO DE PUERTO RICO, demandada y apelada.

Núm. 9933.—*Sometido:* Febrero 1, 1950. *Resuelto:* Junio 23, 1950.

*José G. González* y *E. T. Fiddler,* abogados de los apelantes; *Hon. Procurador General Vicente Géigel Polanco* y *A. Torres Braschi,* abogados de la apelada; *Jaime Sifre, Jr.,* como *amicus curiae.*

El Juez Asociado Señor Snyder emitió la opinión del tribunal.

La Comisión de Servicio Público dictó una resolución promulgando un llamado Reglamento General para las compañías azucareras a tenor con la Ley núm. 221, Leyes de Puerto Rico, 1942 ((1) pág. 1177). El presente es un recurso de apelación entablado por las compañías mencionadas en el epígrafe contra sentencia del Tribunal del Distrito de San Juan confirmando dicha resolución.

■■ La primera contención de las apelantes es que el Reglamento es nulo porque la Comisión lo adoptó "sin indicación alguna de que la misma actuó dentro de las limitaciones fijadas por la Legislatura", y "sin hacer conclusiones de hecho de las cuales una corte apelativa pudiera determinar si actuó o no dentro del ámbito de la autoridad conferídale" por la Ley núm. 221.

Creemos conveniente indicar en primer lugar la diferencia existenté entre el procedimiento provisto por ley para promulgar un reglamento general para las empresas de servicio público en contraste con el procedimiento a tenor con el cual la Comisión emite y las cortes revisan decisiones y órdenes en casos que afectan empresas individuales.

De conformidad con el artículo 38 de la Ley núm. 221 la Comisión podrá dictar "reglas y reglamentos no incongruentes con la ley, que fueren necesarios o propios para el ejercicio de sus facultades o para el desempeño de sus deberes. . . ". En virtud del artículo 19 de la Ley núm. 221, la Comisión, al reglamentar las compañías azucareras, tiene también los poderes y deberes provistos en la Ley núm. 70, Leyes de Puerto Rico, 1917, Vol. II (pág. 433), conocida como la Ley de Servicio Público. El artículo 48 de la Ley núm. 70, según fué enmendado por el artículo 7 de la Ley núm. 2, Leyes de Puerto Rico, 1927, Segunda Sesión Extraordinaria (pág. 399), provee que la Comisión podrá dictar reglas y reglamentos que entrarán en vigor y tendrán fuerza de ley cuando

el Gobernador los apruebe. Ni en la Ley núm. 70 ni en la núm. 221 se provee en cuanto a la celebración de audiencias en relación con tales reglamentos o en cuanto a conclusiones de hecho, basadas en prueba aducida, con anterioridad a su promulgación.

Siempre y cuando que los reglamentos sean verdaderamente generales, no puede existir objeción válida a este método de promulgarlos. La razón es que toda vez que los reglamentos generales son legislativos en su naturaleza, la Legislatura no viene obligada a proveer una vista cuasijudicial antes de su aprobación. *Pacific States Co.* v. *White*, 296 U.S. 176, 186; *United Gas Pipe Line Co.* v. *Federal Power Commission*, 181 F.2d 796 (C.A. D.C., 1950) ; *Bowles* v. *Willingham*, 321 U.S. 503, 519; *Guiseppi* v. *Walling*, 144 F.2d 608, 615 (C.C.A. 2, 1944) ; *Jordan* v. *American Eagle Fire Ins. Co.*, 169 F.2d 281 (C.A. D.C., 1948) ; *Greer* v. *Railroad Commission of Texas*, 117 S.W.2d 142 (Tex., 1938) ; 16 Calif. L.Rev. 208; Fuchs, *Procedure in Administrative Rule–Making*, 52 Harv.L.Rev. 259; Davis, *Administrative Rules–Interpretative, Legislative, and Retroactive*, 57 Yale L.J. 919; 27 Va.L.Rev. 806, 814; Davis, *The Requirement of Opportunity to be Heard in the Administrative Process*, 51 Yale L.J. 1093; Hale, *Hearings: The Right to a Trial, with Special Reference to Administrative Powers*, 42 Ill.L. Rev. 749. Como hemos visto, la Legislatura no hizo disposición alguna para audiencias ante la Comisión sobre tales reglamentos. Y sin audiencias mandatorias no puede existir, desde luego, un requisito, expreso o implícito, al efecto de que al promulgar tales reglamentos la Comisión debe llegar a conclusiones de hecho basadas en *prueba*. En igual forma, aquéllos afectados por los reglamentos no pueden atacarlos a tenor con el procedimiento establecido por los artículos 78–90 de la Ley núm. 70. Esto es así porque, como más adelante se verá en detalle, dichos artículos contemplan el aducir prueba ante la Comisión y la revisión por las cortes

de órdenes de la Comisión basada exclusivamente en el récord ante la misma.

No estamos resolviendo que una parte afectada que quiera atacar tales reglamentos, no tenga un remedio. En este momento no pasamos sobre la cuestión de si una demanda bajo el artículo 14 (c) de la Ley núm. 221, (1) un recurso de *injunction*, una petición de sentencia declaratoria, o algún otro remedio sea procedente, en el cual el demandante pudiera tener la oportunidad de demostrar la nulidad de los reglamentos. Cf. Amadeo, *La Revisión Judicial de los Poderes de la Comisión de Servicio Público de Puerto Rico*, 16 Rev. Jur. de la U.P.R. 245. Tal acción plenaria sería un típico procedimiento contencioso de naturaleza judicial o cuasijudicial en la que una compañía azucarera como demandante tendría la oportunidad de aducir prueba en apoyo de su posición al efecto de que determinados reglamentos son nulos en general o en tanto en cuanto le son aplicables. *Cf. Columbia System v. United States*, 316 U.S. 407; *United Gas Pipe Line Co. v. Federal Power Commission*, supra, y casos citados; *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594; Davis, *Forms of Proceedings for Judicial Review of Administrative Action*, 44 Ill.L.Rev. 565. Aquí sólo resolvemos que toda vez que la Legislatura no aprobó disposición alguna para la celebración de audiencias sobre reglamentos que son legislativos en su naturaleza y toda vez que bajo los artículos 78–90 de la Ley núm. 70 se concede la apelación solamente a base del récord ante la Comisión, no procede la apelación a la corte inferior, y por consiguiente tampoco a este Tribunal, contra una reso-

---

(1) El artículo 14(c) de la Ley núm. 221 prescribe así: "[La compañía puede dirigirse] a la Comisión mediante querella, en la forma que más adelante se dispone en esta Ley, siempre que alegare ser perjudicada por cualquier regla, reglamento, clasificación, u orden cuya observancia y cumplimiento se requiera o se haya requerido por la Comisión; e interpuesta tal querella, dicha compañía azucarera tendrá derecho a una audiencia plena y justa y a una pronta determinación por parte de la Comisión, de su demanda sobre los méritos de la misma, y a todo remedio justo y razonable que fuere congruente con los derechos y deberes de dicha compañía azucarera." (Corchetes nuestros.)

lución promulgando tales reglamentos, a tenor con los artículos 78-90.

▰ Por otro lado, la Legislatura desde luego contempló que la Comisión emitiría decisiones y órdenes que afectarían casos específicos. Proveyó en la Ley núm. 70 que la Comisión celebrara audiencias en tales casos en la forma cuasijudicial corriente. Artículos 62-77. También proveyó en el artículo 78 la apelación al Tribunal del Distrito de San Juan contra tales decisiones y órdenes. Esta apelación se basa exclusivamente en el récord ante la Comisión; la corte inferior no puede admitir nueva evidencia. Artículos 79, 86. La corte inferior determina "en vista de los autos" si la orden apelada "es o no razonable y de acuerdo con la ley", artículo 83; *Commission* v. *Havemeyer*, 296 U.S. 506; *En el Asunto, etc. de Herminia Colón vda. de Semidey*, 59 D.P.R. 248; *ʼMunicipio Guayanilla* v. *Com. Servicio Público*, 51 D.P.R. 374. Bajo el artículo 90 se puede apelar a este Tribunal de la sentencia dictada por la corte de distrito. El artículo 50 de la Ley núm. 221 hace este procedimiento aplicable a órdenes que afecten compañías azucareras.

Es necesario dar énfasis aquí a una ulterior consideración en cuanto a la revisión provista por los artículos 78-90 de la Ley núm. 70. El proveer para esta clase de revisión "evidencia el reconocimiento congresional de que una corte de apelación no tiene base inteligible en qué basar su decisión a menos que un tribunal inferior haya hecho un récord que comprenda todas las cuestiones." *United Gas Pipe Line Company* v. *Federal Power Commission*, supra, pág. 799. Además, no bastan un récord de la prueba más una simple decisión. Solamente si la Comisión, luego de resolver conflictos en la prueba, llega a conclusiones sobre hechos básicos o intermedios y definitivos, es que están las cortes en posición de determinar si la resolución de la Comisión "es o no razonable y de acuerdo con la ley". Las conclusiones deben ser lo suficientemente definidas y ciertas para poner a las cortes en posición de revisar inteligentemente la decisión y determinar

si los hechos tal y como los encontró probados la Comisión ofrecen una base razonable para tal resolución. *Colorado–Wyoming Co.* v. *Comm'n.*, 324 U.S. 626, 634; *United States* v. *Carolina Carriers Corp.*, 315 U.S. 475, 488; 1946, *Annual Survey of American Law*, págs. 227–229; 1945, id., pág. 223; *Saginaw Broadcasting Co.* v. *Federal Communications Commission*, 96 F.2d 554, 559–61, *cert.* denegado, 305 U.S. 613; *Swars* v. *Council of City of Vallejo*, 198 P.2d 955 (Calif., 1948); *Annotation*, 146 A.L.R. 209; Jaffe, *Administrative Findings or The Ameer in America*, 34 Cornell L.Q. 473; Davis, *Official Notice*, 62 Harv.L.Rev. 537. *Cf. Gellhorn, Administrative Law, Cases and Comments*, págs. 770–89; 55 Harv.L.Rev. 279; O'Reilly, *Administrative Findings of Fact*, 11 Fordh.L.Rev. 30. Véanse *South P. R. Sugar Co.* v. *Corte*, 62 D.P.R. 841; *Baetjer* v. *Corte*, 56 D.P.R. 596, 600; *Mayagüez Sugar Co.* v. *Tribl. de Apelación*, 60 D.P.R. 753, 765–67; *Meléndez* v. *Metro Taxicabs*, 68 D.P.R. 766. Como veremos, la Legislatura reconoció este problema y tuvo por miras que tanto bajo la Ley núm. 70 como bajo la Ley núm. 221 la Comisión llegara a conclusiones adecuadas de hecho, basadas en prueba aducida, cuando emitiera resoluciones individuales sujetas a revisión judicial.[2]

De lo anteriormente expuesto surge claro, por lo menos en principio, la distinción entre reglamentos generales, que no son revisables bajo los artículos 78–90 de la Ley núm. 70, y una resolución que envuelve una compañía específica fundada en conclusiones basadas en prueba aducida, que puede apelarse para ante el Tribunal del Distrito de San Juan y

---

[2] Casi es innecesario añadir que la naturaleza de las conclusiones exigidas depende de lo complejo que sea el caso. La Legislatura no tuvo por miras que la Comisión venga obligada a llegar a conclusiones detalladas y elaboradas en cuanto a todo asunto trivial en que tenga que actuar. *Cf. Am. Railroad Co.* v. *Com. Servicio Público*, 62 D.P.R. 359; Davis, *Administrative Powers of Supervising, Prosecuting, Advising, Declaring, and Informally Adjudicating*, 63 Harv.L.Rev. 193, 236, *et seq.* Pero ese saludable principio de administración efectiva no justifica que se prescinda del requisito de suficientes conclusiones en casos tan importantes y complicados como el de fijar tarifas y servicios en la industria azucarera.

en última instancia a este Tribunal Supremo, con el fin de que las cortes puedan determinar si dicha resolución "es o no razonable y de acuerdo con la ley".

■ Lo que hemos dicho no quiere decir, sin embargo, que la Comisión pueda, so pretexto de los reglamentos generales, expedir resoluciones que sean generales en su forma pero que en efecto tengan un impacto individual sobre cuestiones con respecto a las cuales la Ley núm. 221 requiere acción individual por parte de la Comisión luego de celebrar una audiencia, llegar a conclusiones de hecho basadas en la prueba aducida, y aprobar una resolución que está sujeta a revisión judicial. Aunque calificada erróneamente de "reglamentos", tal actuación de la Comisión sería en sustancia una resolución de la Comisión y por consiguiente revisable bajo los artículos 78–90 de la Ley núm. 70, con todas las salvaguardias y requisitos ya indicados.

■■ A la luz de lo anterior, pasemos al llamado Reglamento General aquí envuelto. Consideraremos primeramente la manera en que fué promulgado. La propia Comisión redactó un proyecto de Reglamento y lo sometió a las compañías. Se celebró una llamada audiencia en la que se adujo prueba consistente en comentarios generales sobre algunas de las cláusulas propuestas. Luego de celebrada la audiencia, la Comisión hizo algunas enmiendas y añadió alguna materia nueva, sobre las cuales no se notificó previamente a las compañías y no se celebró audiencia sobre las mismas. Entonces la Comisión adoptó este nuevo proyecto como el "Reglamento General para las Compañías Azucareras" en virtud de la resolución que más tarde fué confirmada por sentencia de la corte inferior y que ahora pende ante nos.

La resolución de la Comisión decía que se aprobaba el Reglamento a tenor con el artículo 38 de la Ley núm. 221 y que el Reglamento no tendría efecto hasta que lo aprobase el Gobernador, según lo exigía el artículo 48 de la Ley núm. 70, según fué enmendado por la Ley núm. 2 de 1927, que es aplicable en virtud del artículo 19 de la Ley núm. 221. Luego el

Reglamento General fué aprobado por el Gobernador. La resolución no contiene conclusiones de hecho, basadas en prueba, bien en términos generales o en tanto es aplicable a compañías específicas. Tampoco dice ya sea general o específicamente que el Reglamento cumple con las diversas normas establecidas por la Ley núm. 221 en relación con tarifas, servicios y facilidades. Sólo dice que a juicio de la Comisión el Reglamento es "legal y razonable" y que aun cuando es de aplicación general y uniforme, el artículo 21 dispone que la Comisión puede por justa causa eximir a cualquier compañía del cumplimiento de cualquier disposición del Reglamento por el tiempo que juzgue razonable la Comisión y bajo condiciones razonables.

Es obvio que en el presente caso la Comisión siguió el procedimiento establecido para la promulgación de reglamentos generales y no aquél establecido para resoluciones que afecten casos individuales. Es cierto que se celebró una audiencia. Pero ésta fué de naturaleza general más bien que controversial. Fué algo parecido a la clase de audiencia que se celebra bajo la sección 4 de la Ley Federal sobre Procedimiento Administrativo antes de que entren en vigor reglamentos que son legislativos en su naturaleza. 5 U.S.C.A. sección 1004; *United Gas Pipe Line Company* v. *Federal Power Commission*, supra. Si bien nuestra Ley no lo exige, debe estimularse esta clase de audiencias para darle a la Comisión el beneficio de los puntos de vista de todas las partes envueltas antes de que se promulguen tales reglamentos. Pero difícilmente podría resolverse que constituyen un sustituto adecuado para la audiencia, conclusiones, y revisión judicial provistas por la Ley núm. 70 para las resoluciones individuales. *Jordan* v. *American Eagle Fire Ins. Co.*, supra.

La propia Comisión claramente entendió que estaba celebrando la clase de audiencia de ordinario celebrada en relación con reglamentos generales más bien que la clase de audiencia exigida para decidir un caso individual. Citó el artículo 38 como la fuente de su autoridad para adoptar el

Reglamento.(³) Éste se hizo aplicable generalmente más bien que individualmente. La Comisión no llegó a conclusiones de hecho que resolvieran los conflictos en la "prueba", si es que esta palabra puede usarse para describir lo que ocurrió durante la audiencia. En el Reglamento, tal y como lo aprobó la Comisión, aparece materia nueva, no comprendida en el proyecto original del propuesto Reglamento y no discutida en la audiencia. Finalmente, el Reglamento fué sometido a y aprobado por el Gobernador, según lo exige el artículo 48 de la Ley núm. 70, según ha sido enmendado. Si bien este último paso es propio para reglamentos de naturaleza .legislativa, la Legislatura con toda razón no proveyó que órdenes corrientes, producto de un procedimiento contencioso de naturaleza cuasijudicial y que tienen un efecto individual, deben ser sometidas al Gobernador para su aprobación. Por el contrario, proveyó para una revisión directa de éstas por las cortes sin la intervención del Gobernador.

Por tanto es claro que si cualquiera de las disposiciones del llamado Reglamento General fuera en efecto una orden individual más bien que reglamentos generales, aquél es nulo porque no se celebraron audiencias, ni se hicieron conclusiones de hecho, basadas en prueba, según lo exige la Ley núm. 70 para órdenes de esta clase. Pero al determinar si cualquiera de los Reglamentos era individual más bien que general, debemos tener en cuenta ciertas consideraciones con referencia a la industria azucarera. La Ley núm. 221 entre otras cosas confiere a la Comisión autoridad y el deber de (1) asegurar a los colonos un trato justo, que se hace necesario por la ventajosa posición de las compañías, y (2) fijar

---

(³) Si bien no lo hizo en la orden original, en la corte inferior y en este Tribunal la Comisión descansa también en el artículo 22 de la Ley núm. 221 que reza así: "La Comisión tendrá la facultad de reglamentar e inspeccionar a toda compañía azucarera y aprobará y pondrá en vigor las reglas y reglamentos necesarios para ello." Sin embargo, según claramente se desprende del referido artículo, el mismo reitera pero nada añade a los poderes conferidos a la Comisión por el artículo 38 en lo que atañe a la cuestión ahora ante nos.

a las compañías, que son declaradas empresas de servicio público, un beneficio razonable sobre el valor justo de sus bienes dedicados al servicio público. *Compañía Azucarera del Toa* v. *La Comisión de Servicio Público de Puerto Rico*, ante, pág. 212; *Pueblo* v. *A. Roig, Sucrs.*, 63 D.P.R. 18, confirmado en 147 F.2d 87 (C.C.A. 1, 1945). Estos dos conceptos están relacionados entre sí: el tipo de beneficio para las compañías, aun cuando tiene que ser razonable, debe ser fijado en tal forma por la Comisión de suerte que los colonos reciban un trato justo, el cual la Legislatura creyó que no recibirían sin la protección de la Ley núm. 221 y de los reglamentos y órdenes de la Comisión promulgados a tenor con la misma. En igual forma, bajo la Ley núm. 221, los diversos servicios y facilidades a ser prestados por las compañías a los colonos deben ser reglamentados por la Comisión de manera que cumplan con estos propósitos de la Ley.

██ ██ A los fines del problema que está ahora ante nos, la cuestión importante es que, al declarar a las compañías empresas de servicio público y al disponer que a cada compañía debe permitírsele que reciba un beneficio razonable sobre el valor justo de sus bienes, de acuerdo con la complicada fórmula establecida en *Smyth* v. *Ames*, 169 U.S. 466, la Legislatura en efecto ordenó a la Comisión que tratara a cada compañía como un "problema individual". *Compañía Azucarera del Toa* v. *La Comisión de Servicio Público de Puerto Rico*, supra, pág. 224, nota 6. Según dijimos en el caso de *Toa*, esto fué una total revocación de la filosofía que hay detrás de la Ley núm. 112, Leyes de Puerto Rico, 1937, que estableció normas y tarifas uniformes para la molienda, por las compañías, de cañas de azúcar pertenecientes a los colonos. *Vidal* v. *Fernández*, 104 F.2d 606 (C.C.A. 1, 1939), cert. denegado, 308 U.S. 602. Véanse *Luce & Co.* v. *Junta Salario Mínimo*, 62 D.P.R. 452; *Opp Cotton Mills* v. *Administrator*, 312 U.S. 126.

La autoridad de la Comisión para resolver el "problema individual" de fijar tarifas a cada compañía, lo cual viene obligada a hacer mediante órdenes individuales, emana pri-

mordialmente del artículo 21 de la Ley núm. 221.(⁴) Pero al tratar conjuntamente las tarifas y servicios en el artículo 21, la Legislatura reconoció que las tarifas, los servicios y las facilidades están inextricablemente entrelazadas. Es decir, la Comisión no podía ordenar servicios a ser prestados sin al mismo tiempo o con anterioridad haber fijado las tarifas a cobrar por tales servicios. Resolver lo contrario sería hacer caso omiso del mandato de la Legislatura al efecto de que cada compañía debe recibir un beneficio razonable sobre el valor justo de sus bienes.

Es cierto que el artículo 21 no hace mención de audiencia alguna o de conclusiones de hecho individuales para cada compañía. Pero el artículo 28, de modo un tanto traslapador, provee para la fijación de facilidades y servicios "después de una vista". Asimismo, los artículos 24–27, que también tienen que ver con las tarifas, servicios y facilidades, específicamente prescriben que se celebrarán audiencias sobre los mismos. Además, el artículo 50 de la Ley núm. 221 provee que todas las audiencias ante la Comisión a tenor con la Ley se celebrarán con arreglo a los artículos 62–90 de la Ley núm. 70. Y ya hemos indicado que bajo dichos artículos son necesarias no solamente una audiencia sino conclusiones de hecho en las cuales se pueda basar una revisión judicial inteligente.

---

(⁴) El artículo 21 de la Ley núm. 221 provee en parte como sigue:

"La Comisión tendrá la facultad y el deber de fijar y determinar los precios, tipos, tarifas, compensación, normas, o condiciones de manufactura, elaboración o refinación de azúcar, justos, debidos, iguales y razonables que deben establecerse, exigirse, demandarse, cargarse o cobrarse por las compañías azucareras, por cualquier servicio prestado o suministrado; y los reglamentos y prácticas justos, debidos, iguales, razonables y apropiados relacionados con dichos precios, tipos, tarifas, compensaciones, normas y condiciones de elaboración o refinación de azúcar, que deberán observarse por cualquiera de dichas compañías azucareras. La Comisión podrá clasificar dichos precios, tipos, tarifas, compensaciones, normas y condiciones de elaboración y refinación de azúcar. La Comisión tendrá el poder de alterar, enmendar, modificar, o derogar cualquier tipo, tarifa, compensación, norma y condición vigentes en la actualidad que no fueren justos, debidos, iguales y razonables."

Las disposiciones de la Ley núm. 221 demuestran que la Legislatura tenía conocimiento de que las tarifas individuales contempladas por la Ley núm. 221, que deben proveer un beneficio razonable sobre el valor justo de sus propiedades para cada compañía bajo sus propias circunstancias especiales, sólo pueden establecerse en virtud de audiencias y conclusiones de hecho. Esto se torna aun más evidente cuando tenemos en cuenta el hecho de que las órdenes que fijan tales tarifas están sujetas a revisión judicial de conformidad con la Ley núm. 70. En ausencia de una audiencia, prueba y conclusiones basadas en ésta, como hemos visto, la revisión judicial sería una farsa, ya que no habría récord ni conclusiones de las cuales las cortes pudieran determinar si la orden de la Comisión estableciendo tarifas individuales para cada compañía era, bajo sus circunstancias especiales, "razonable y de acuerdo con la ley". Y, como ya se ha indicado, los servicios que deben ser rendidos para recibir estas tarifas están en la misma categoría y no podrían ser fijados excepto individualmente y como parte del procedimiento para fijar la estructura tarifaria de cada compañía. ([5])

---

([5]) En el caso de *Toa* la Comisión alegó que "No consideramos que sería buena administración pública el que se procediese a establecer tarifas permanentes sin haber reglamentado la industria azucarera en todos sus aspectos." Sin embargo, resolvimos en el caso de *Toa* que no se podía permitir que este punto de vista de la Comisión frustrara el mandato de la Legislatura en la Ley núm. 221, al efecto de que las tarifas provisionales a ser cobradas por determinada compañía no podían ser fijadas hasta que se comenzara el procedimiento para fijar tarifas permanentes. Por igual motivo, la Comisión no puede expedir reglamento u orden alguna, so pretexto de ser un reglamento general aplicable uniformemente a todas las compañías, si está relacionada directamente con los servicios a ser prestados por determinada compañía, en ausencia de una orden válida de la Comisión fijando ya sean tarifas provisionales o ya sean permanentes a ser cobradas por la compañía por tales servicios. Según dijimos en una situación similar en el caso de *Toa*, la alegación de falta de fondos en la Comisión no puede emplearse para hacer caso omiso del mandato de la Ley núm. 221 al efecto de que los servicios, parte inextricable de las tarifas, no pueden ser ordenados sin fijar las tarifas a cobrarse por los mismos por cada compañía, como un "problema individual". El remedio está en la asignación de fondos adicionales para la Comisión o en enmendar la Ley núm. 221.

 Es obvio que aquellas disposiciones del Reglamento General que directamente afectan los servicios a ser rendidos por las compañías, no pueden subsistir por dos motivos. En primer lugar, son nulos porque la Comisión hasta el presente no ha fijado tarifas válidas, provisionales o permanentes, a ser cobradas por los mismos. *Compañía Azucarera del Toa v. La Comisión de Servicio Público de Puerto Rico*, supra. En segundo lugar, independientemente del hecho de que la Comisión no puede ordenar la prestación de servicios sin fijar tarifas para los mismos, el llamado Reglamento aquí envuelto, en cuanto afecta directamente servicios a ser rendidos por las compañías, no es un reglamento general sino una orden individual que, según ya hemos visto, requiere de acuerdo con las Leyes núms. 70 y 221, una audiencia, prueba, conclusiones de hecho, y resoluciones sujetas a revisión judicial. Y estos requisitos no fueron cumplidos aquí.

Es indudable que debido a que la Comisión (1) no fijó tarifas y (2) no celebró audiencias, no llegó a conclusiones de hecho y no dictó órdenes sujetas a revisión judicial, son nulas aquellas disposiciones del Reglamento General que directamente afectan los servicios a ser rendidos por las compañías. Caen en esta categoría el artículo 7, que provee para arrastre y arrimo de caña; el artículo 11, que provee para la liquidación de cañas y disposición y pago de azúcar; el artículo 12, que trata de la liquidación de mieles; y el artículo 19, que provee para las tarifas a cobrarse. En vista de las disposiciones de la Ley núm. 221 y de las materias comprendidas en estos artículos, éstos no podían adoptarse como Reglamento General a tenor con el artículo 38 de la Ley núm. 221, y por tanto son nulos.

 Por otro lado, las disposiciones restantes caen en una categoría diferente. Los artículos 1 al 4, que exponen el propósito, la fecha de vigencia, la aplicación y los términos y definiciones, no tienen materia sustantiva y por consiguiente nada tenemos que ver con los mismos. El artículo 5 prescribe las obligaciones preliminares que las compañías deben

cumplir antes de la zafra. El incio (*a*) provee la notificación a la Comisión veinte días antes de iniciarse la zafra y el tonelaje de caña estimado para la misma. El inciso (*b*) ordena al colono entregar a la central, en impresos suministrados por ésta en triplicado, pero redactada por la Comisión, no más tarde del 15 de noviembre de cada año, antes de iniciarse la zafra, cierta información contenida en doce preguntas, con respecto a sus fincas. Según dicen las compañías en su alegato, los últimos ocho de estos doce requisitos no estaban en el Reglamento originalmente propuesto. Fueron insertados por la Comisión después de celebrarse la audiencia, y en consecuencia en los autos no hay evidencia en cuanto a ellos.

De igual manera, los incisos (*c*), (*d*) y (*e*) fueron adicionados al Reglamento luego de celebrada la audiencia. El inciso (*c*) provee que las compañías designarán inspectores de colonos para estimar siembras y tonelaje, y sus estimados aparecerán como estimados preliminares en el impreso a llenarse por los colonos. El inciso (*d*) dispone que en o antes del día 1 de diciembre las compañías deben remitir a la Comisión copia de cada uno de los informes radicados por los colonos juntamente con ciertos cálculos basados en estos informes. El inciso (*e*) prescribe que, al preparar el "Programa Tentativo de Arrimo y Molienda", la compañía no incluiría en el mismo aquellos colonos que no hayan informado de conformidad con los incisos anteriores, sin la previa autorización de la Comisión, la cual dará ésta si el colono luego radica su informe que se remitirá por la compañía a la Comisión con sus observaciones y recomendación.

El inciso (*f*) le exige a la compañía que, no más tarde de 15 días antes de dar comienzo la zafra, presente a la Comisión un "Programa Tentativo de Arrimo y Molienda" conteniendo estimados de tonelaje de diferentes clases de caña y de la producción diaria. También provee la fijación del Programa en la oficina de la central en un sitio accesible a examen y vista de los colonos. El inciso (*g*) dispone la contrastación y

calibración, por el Negociado de Pesas y Medidas de la Comisión, de todo aparato de medir o pesar que se use en las centrales, antes de dar comienzo la zafra. El inciso ($h$) provee que las centrales tendrán aquellos aparatos "standard" necesarios para dar cumplimiento al inciso ($g$). · El inciso ($i$) requiere que las centrales de los distritos Norte, oriental e interior estén listas para empezar la zafra el 15 de enero y las centrales de los distritos Sur y occidental el 15 de diciembre, a menos que la Comisión, por causa justificada, extienda el término.

El artículo 6, inciso ($a$), fija las fechas de iniciarse la molienda en cinco distritos según los ha clasificado la Comisión, a no ser que la Comisión autorice fechas diferentes. El inciso ($b$) dispone que la zafra durará todo el tiempo que sea necesario para moler las cañas de los colonos, y que ninguna central puede terminar su zafra sin haber molido todas las cañas de sus colonos, a menos que previamente haya hecho los arreglos pertinentes para la molienda en otra central de las cañas que quedasen sin moler, y también dispone que las compañías notificarán a la Comisión con veinte días de antelación la fecha probable para la terminación de la zafra. El inciso ($c$) dispone que la Comisión, *motu proprio* o a petición de cualquier parte interesada y previa notificación y audiencia, puede fijar fechas diferentes cuando las circunstancias así lo justifiquen a juicio de la Comisión. El inciso ($d$) divide las centrales en cinco distritos: el Norte, el Sur, el Oriental, el Occidental y el Interior.

El artículo 8 ordena que las cañas se pesarán en determinados sitios; que la caña se recibirá en la factoría por orden de llegada; y que la Comisión puede exigir la capacidad y tipo de romana que estime apropiados.

El artículo 9, inciso ($a$), prescribe que las compañías molerán las cañas de los colonos dentro de veinticuatro horas siguientes a su llegada al batey de la central, excepto en casos de fuerza mayor. El inciso ($b$) dispone que el inciso ($a$) no es de aplicación a caña que quede en el batey al pararse

la molienda al final de la semana para la limpieza del molino. El inciso (c) provee que la caña recibida por el molino debe estar libre de paja y tierra dentro de límites razonables. El inciso (d) prescribe que caña accidentalmente quemada deberá molerse con preferencia a cualquier otra caña, excepto la recibida con anterioridad en el batey. El inciso (e) provee que en caso de huelga, rotura de maquinaria, o accidente, etc., que impidan la molienda, la central notificará al colono y éste puede, con la aprobación de la Comisión, moler sus cañas en otra central hasta que se le notifique que la central puede reasumir el servicio.

El artículo 10 establece la fórmula a emplearse por la central para determinar el rendimiento en azúcar de las cañas y la participación de los colonos. En su alegato las apelantes manifiestan que "la Comisión simplemente ha cogido una fórmula que se ha usado corrientemente y la ha hecho obligatoria."

El artículo 13 permite a los colonos designar sus propios inspectores y requiere que cualquier sistema de inspección de los colonos sea sometido a la Comisión para aprobación y reglamentación. El artículo 14 exige a las compañías rendir ciertos informes de naturaleza técnica, durante varios períodos.

El artículo 15(a) dispone que cada compañía está limitada a moler cañas de terrenos que produjeron cañas que se molieron en la misma central durante la zafra de 1943, excepto cuando la Comisión haya autorizado transferencias. En cuanto a este artículo, las apelantes dicen en su alegato, "El efecto práctico es decir 'Hagan lo que siempre han hecho.' No presenta problema alguno a los fines de esta apelación."

El inciso (a) del artículo 16 provee que las compañías podrán usar el sistema de contabilidad que hasta la fecha han venido usando, hasta que la Comisión apruebe un sistema uniforme de contabilidad. El inciso (b) dispone que a los fines de fijar una tarifa, la Comisión usará las operaciones de las compañías para un año natural. El inciso (c) provee

que si la zafra comienza antes del 1 de enero, los gastos e ingresos derivados durante el período anterior a enero 1, se considerarán como pertenecientes al año siguiente.

El artículo 17 prescribe que las compañías conservarán todas sus facilidades en buena condición física con el fin de rendir un servicio adecuado y eficiente. El artículo 18 exige se informen los accidentes a la Comisión. El artículo 20 deroga todas las órdenes y reglamentos en conflicto. El artículo 21 provee que la Comisión puede por justa causa eximir a cualquier compañía del cumplimiento de cualquiera de las disposiciones del Reglamento durante un tiempo razonable y bajo condiciones razonables. El artículo 22 dispone que las compañías que no cumplan con el Reglamento estarán sujetas a las penalidades señaladas en las Leyes núm. 221 y núm. 70. El artículo 23 prescribe que los artículos son separables y quedarán en vigor en caso de que cualquier artículo sea declarado nulo.

Como ninguno de los artículos antes descritos cae dentro de la categoría de órdenes individuales, éstos no son revisables bajo los artículos 78–90 de la Ley núm. 70. Por consiguiente las apelantes han elegido erróneamente su remedio al proceder bajo la misma en cuanto a estos artículos. No expresamos criterio alguno en cuanto a la validez de ellos. Como ya se ha indicado, pueden existir otros medios por los cuales las compañías puedan iniciar procedimientos que levanten esa cuestión. Pero la corte inferior no tenía jurisdicción en este caso. En cuanto a estos artículos, la sentencia del Tribunal del Distrito de San Juan será por tanto dejada sin efecto y el caso desestimado por falta de jurisdicción.(⁶)

El resultado a que hemos llegado hace innecesario que consideremos las restantes contenciones de las apelantes.

---

(⁶) La Comisión no levantó la contención de que la corte inferior no tenía jurisdicción en cuanto a estos artículos del Reglamento. Sin embargo, hemos examinado este punto bajo la conocida regla de que cuestiones de jurisdicción pueden y deben considerarse *motu proprio*. *Russell & Co. v. Com. Servicio Público*, 66 D.P.R. 372.

*Por los motivos expuestos, la sentencia del Tribunal del Distrito de San Juan será dejada sin efecto, y se dictará nueva sentencia revocando la resolución de la Comisión de Servicio Público adoptando los artículos 7, 11, 12 y 19 del Reglamento General, y desestimando por falta de jurisdicción el procedimiento en cuanto a los artículos 1–6, 8–10, 13–18 y 20–23 del referido Reglamento.*(⁷)

El Juez Asociado Sr. Negrón Fernández se inhibió.

---

(⁷) Para una hábil discusión de las cuestiones envueltas en este caso, véase Davis, *Administrative Findings, Reasons, and Stare Decisis,* 38 Calif. L.Rev. 218 (Junio 1950), que llegó a nuestras manos después de haberse redactado esta opinión. *

* Adicionado por resolución de julio 20, 1950.