SOUTH PORTO RICO SUGAR Co., apelada, *v.* COMISIÓN DE SERVICIO PÚBLICO, apelante; JOSÉ RAMÓN QUIÑONES, interventor y apelante.

Núm. 10546.—*Sometido:* Mayo 5, 1952. *Resuelto:* Julio 10, 1952.

606

*Hon. Procurador General Víctor Gutiérrez Franqui, A. Torres Braschi y Edgar S. Belaval, Procuradores Generales Auxiliares,* abogados de la apelante, Comisión de Servicio Público; *Pablo Defendini,* abogado del interventor apelante; *James R. Beverley, R. Castro Fernández y Francisco Castro Amy,* abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR MARRERO emitió la opinión del tribunal.

Se originó este caso en la Comisión de Servicio Público. José Ramón Quiñones por sí y en representación y para bene-

ficio de otros colonos de la Central Guánica presentó allí una querella en la que alegó, fundamentalmente, que durante la zafra de 1949 fué colono de dicha Central, perteneciente a la querellada South Porto Rico Sugar Co.; que para ese año ésta liquidó los azúcares de sus colonos, comprendidos en la cuota de azúcares vendibles fijada por las autoridades federales, a base del precio promedio para dichos azúcares durante el período de liquidación establecido por la Comisión de Servicio Público, menos los gastos de venta y mercadeo, pagando la querellada en dinero su importe correspondiente al finalizar el período de liquidación; pero que los azúcares no comprendidos en la referida cuota quedaron en poder de la querellada en calidad de depósito, sin que ésta adquiriera derecho alguno sobre los mismos, ni por disposición de ley ni por convenio o contratación con sus dueños; y que luego de terminada la zafra de 1949, las autoridades federales ampliaron en tres ocasiones la cuota de azúcares vendibles, y la querellada, asumiendo el carácter de agente de sus colonos, procedió a vender azúcares de los retenidos en depósito como excedentes de la cuota primeramente fijada, y sin que mediara convenio o contratación alguna, liquidó los azúcares así vendidos a base del precio promedio que, de haberse podido vender dichos azúcares cuando se produjeron, se hubiese obtenido durante el período de liquidación correspondiente, menos los gastos de venta y mercadeo, a pesar de que el precio obtenido por la querellada fué sustancialmente más alto.

Contestó la querellada negando los hechos esenciales de la querella y alegando que durante la zafra de 1949 y de acuerdo con la determinación del Secretario de Agricultura de los Estados Unidos (Production & Marketing Administration), ella liquidó el 81 por ciento de los azúcares correspondientes a cada colono, al precio promedio mensual del producto puesto en Nueva York, menos gastos de venta y mercadeo; que posteriormente dicho Secretario reajustó las cuotas de azúcares vendibles y autorizó la liquidación a los colonos hasta

el 93.5401502 por ciento, todo lo cual ella hizo, quedando por liquidar solamente la cuota de los azúcares excedentes, ascendente a 6.4598498 por ciento de la producción total de dicha zafra, la cual vendrá obligada a liquidar a sus colonos al precio promedio en el mercado de Nueva York durante el período de enero 1º a febrero 15 de 1950, menos gastos de venta y mercadeo.

Trabada así la contienda, y luego de una vista en que las partes ofrecieron prueba testifical y documental, la Comisión de Servicio Público dictó amplia resolución ordenando a la querellada South Porto Rico Sugar Co. que liquidara a sus colonos los azúcares de la cosecha del aludido año que el Secretario de Agricultura de los Estados Unidos autorizó vender en exceso de la cuota original de 910,000 toneladas, al precio o precios a que dichos azúcares fueron vendidos por la querellada. Solicitada reconsideración por ésta, la misma fué declarada sin lugar. Apeló entonces la South Porto Rico Sugar Co. para ante el extinto Tribunal de Distrito de San Juan. Después de una amplia vista éste dictó sentencia revocando y dejando sin efecto en todas sus partes la resolución recurrida y ordenando a la Comisión que dictara nueva resolución declarando sin lugar la querella. En la opinión dictada en apoyo de su sentencia, dicho tribunal consideró probados los siguientes hechos:

"1. Que para la zafra de 1949 la apelante South Porto Rico Sugar Co., dueña de la Central Guánica, compró a todos sus colonos todas las cañas por ellos producidas.

". . . . . . . . .

"8. Que en abril 16, 1949 la apelante certificó al Secretario de Agricultura Federal el método que iba a seguir para la liquidación de las cañas de los colonos haciendo constar que liquidaría en dinero mensualmente, excepto el azúcar no vendible la cual sería liquidada al precio promedio de azúcar crudo durante el período de enero 1, 1950 a febrero 15, 1950, según se especificaba en el 'Aviso' que acompañaba.

"9. Que el 'Aviso' que se acompañó a dicha certificación es uno de fecha marzo 1, 1949, enviado a todos los colonos, en el

cual se hace constar que se iba a liquidar el 81 por ciento del azúcar correspondiente al colono al precio promedio mensual del azúcar puesta en New York incluyendo coste, seguro y flete y la liquidación del 19 por ciento restante, excedente estimado sobre la cuota de producción asignada a la Isla, sería retenida hasta principios de marzo 1950 para ser liquidada al precio promedio correspondiente al período de enero 1ro. a febrero 15, 1950 del azúcar puesta en New York incluyendo coste, seguro y flete. En dicho Aviso se notificó además a los colonos que si hubiese un aumento en la cuota de azúcar vendible durante el corriente año, la apelante la liquidará al precio promedio mensual del azúcar puesta en New York incluyendo coste, seguro y flete.

"10. Que la apelante liquidó, tanto la cuota original de 81 por ciento de la cosecha como las cuotas adicionales de azúcar vendible, o sea de 81 por ciento a 93.5401502 por ciento de la cosecha, a base del precio promedio en el mercado de New York durante el período en que fueron molidas las cañas, o sea, durante el período de liquidación fijado por la Comisión, menos gastos de venta y mercadeo.

"11. Que la apelante liquidó a sus colonos el restante 6.4598498 por ciento de la cosecha, o sea, la cuota de azúcar excedente, al precio promedio en el mercado de New York durante el período de enero 1ro. a febrero 15, 1950 menos gastos de venta y mercadeo.

". . . . . . . . . . . . . . .

"14. Que la apelante vendió el azúcar de cuota adicional vendible a un precio mayor que al precio en que la liquidó a sus colonos, habiendo hecho su última venta según contrato de noviembre 10, 1949.

"15. Que en diciembre 19, 1949 fué la primera vez que los colonos hicieron a la apelante reclamación sobre la forma de liquidar el azúcar de cuota adicional vendible, reclamando entonces y por primera vez que la apelante ha debido de liquidarles al precio en que la apelante vendió dicho azúcar y no al precio promedio en el mercado de New York durante el período en que entregaron las cañas que fué al precio en que les liquidó dicho azúcar.

"16. Que al empezar la zafra de 1949 la apelante tenía archivadas en la Comisión de Servicio Público dos formas de contrato con sus colonos; una en forma de escritura notarial y

la otra en forma de carta contrato, las cuales contenían sus condiciones de molienda.

"·  ·  ·  ·  ·  ·  ·  ·  ·

"18. Que antes de empezar la referida zafra la Comisión de Servicio Público había aprobado el Reglamento General para las Compañías Azucareras y los artículos 7, 11, 12 y 19 de dicho Reglamento fueron declarados nulos por el Tribunal Supremo de Puerto Rico en el caso de *Godreau & Co. v. Comisión de Servicio Público*, 71 D.P.R. 649, resuelto el 23 de junio de 1950."

También figuran en su opinión las siguientes conclusiones de derecho:

"1. Que los contratos otorgados por la apelante y sus colonos para la compra de las cañas producidas por éstos durante la zafra de 1949, son válidos.

"·  ·  ·  ·  ·  ·  ·  ·  ·

"2. Que la apelante era dueña exclusiva de toda azúcar producida durante la zafra de 1949 de cañas cosechadas por sus colonos.

"...la evidencia presentada ante la Comisión demuestra claramente que la apelante no se limitó a comprar a sus colonos el azúcar de cuota original vendible. ...

"3. Que la apelante no perdió su título de dueña absoluta del azúcar producido por las cañas cosechadas por los colonos, por el hecho de no haber pagado el importe de las liquidaciones del azúcar de cuota adicional a su debido tiempo.

"Cierto es que de acuerdo con las condiciones de molienda de la apelante (exhibit 5, cláusula I) ésta venía obligada a pagar a sus colonos las liquidaciones de sus cañas dentro de los diez primeros días de cada mes posterior a la entrega de las cañas, pero el incumplimiento de tal condición no conlleva la pérdida del título de las cañas compradas y menos convirtió a la apelante en agente vendedor de los colonos."

De la sentencia así dictada por el tribunal inferior apelaron tanto el interventor José Ramón Quiñones como la Comisión de Servicio Público. En apelación han radicado un alegato conjunto y en el mismo imputan a dicho tribunal haber errado al sostener: (1) que la South Porto Rico Sugar Co. compró a todos sus colonos todas las cañas producidas por

éstos; (2) que ésta era dueña exclusiva de todo azúcar producido por las cañas de sus colonos durante la zafra de 1949; (3) que ella podía válidamente comprar las cañas producidas por sus colonos mediante contratos a ese efecto; (4) que el aviso de marzo 1º, 1949 (exhibit 12) dió derecho a la South Porto Rico Sugar Co. a liquidar las ventas de azúcares excedentes de la cuota básica al mismo precio a que se vendieron los azúcares de dicha cuota; (5) que ella tenía derecho a liquidar los azúcares producidos por las cañas de sus colonos, correspondientes a la participación tarifaria de éstos por su propia determinación; y (6) al dictar sentencia anulando la resolución de la Comisión y ordenado a ésta que dicte otra declarando sin lugar la querella.

Como se ha visto, para la zafra de 1949 las autoridades federales fijaron a la Isla de Puerto Rico una cuota de 910,000 toneladas de azúcar. Ese tonelaje representaba el 81 por ciento de la totalidad de los azúcares producidos aquí. Por comunicaciones dirigidas a la South Porto Rico Sugar Company en 26 y 31 de agosto y en 30 de septiembre de 1949 el Departamento de Agricultura de los Estados Unidos informó a aquélla haber concedido cuotas adicionales por un monto total de 12.55 por ciento.[1]   En su consecuencia, del total de los azúcares fabricados durante la zafra en cuestión solamente quedó un sobrante ascendente a 6.45 por ciento. Sobre el 81 por ciento de la cuota originalmente autorizada y sobre el 6.45 por ciento correspondiente a los azúcares producidos en exceso de la cuota no hay controversia de clase alguna.   El problema aquí envuelto gira enteramente en torno del precio a ser pagado por el 12.55 por ciento de los azúcares vendidos como cuotas adicionales.   La contención del querellante original (aquí interventor-apelante) fué y es que

[1] La cuota original fué, como se ha dicho, del 81 por ciento de los azúcares producidos.  Por carta dirigida por el Departamento de Agricultura de los Estados Unidos a la South Porto Rico Sugar Co. en 26 de agosto de 1949 se informó a ésta que la cuota se aumentaba a .840585617; por otra del 31 de mismo mes a .878815517 y por una tercera fechada el 30 de septiembre a .935401502.

esos azúcares de cuotas adicionales deben liquidarse al precio a que realmente los mismos fueron vendidos. La de la South Porto Rico Sugar Co., por el contrario, siempre ha sido que tales azúcares deben liquidarse, como fueron por ella liquidados, al precio promedio mensual en el mercado de Nueva York durante el período en que las cañas fueron entregadas.(²)

▇▇▇ Pasaremos ahora a discutir los errores señalados: La primera conclusión de hechos que aparece en la opinión del tribunal inferior, que ha sido copiada más arriba, al efecto de "que para la zafra de 1949 la apelante South Porto Rico Sugar Co., dueña de la Central Guánica, compró a todos sus colonos todas las cañas por ellos producidas" no está en forma alguna sostenida por la prueba que dicho tribunal tuvo ante su consideración. Lo que esa prueba demostró fué que el 81 por ciento de los azúcares producidos por las cañas entregadas por los colonos, correspondiente a la cuota originalmente autorizada por el Secretario de Agricultura de los Estados Unidos, fué liquidado a éstos por la South Porto Rico Sugar Co. al precio promedio prevaleciente en el mercado de Nueva York, dentro de los 14 días siguientes al mes en que las cañas se entregaron por los colonos y se molieron por la Central. Empero, repetimos, sobre este 81 por ciento no hay controversia alguna. Por tanto, en cuanto al mismo es innecesario determinar si la querellada compró las cañas o los azúcares de los colonos, o si por el contrario meramente

(²) El precio promedio para los azúcares correspondientes al 81 por ciento de cuota orginal fluctuó entre $5.628 y $5.86 por quintal. Esos azúcares se liquidaron dentro de los 14 días siguientes al período de liquidación en que las cañas fueron entregadas, o sea enero a junio de 1949.

Loz azúcares correspondientes al 6.45 por ciento de exceso de cuota fueron liquidados al precio promedio que prevaleció entre enero 1⁰ y febrero 15 de 1950, o sea $5.719. Los colonos recibieron esas liquidaciones en febrero de 1950.

Los azúcares correspondientes al 12.55 por ciento, total de las tres cuotas adicionales, se liquidaron al precio que rigió para cada período de liquidación en que se molieron las cañas, 1⁰ de enero a 30 de junio de 1949. Se vendieron a un precio que fluctuó entre $5.85 y $6.03 el quintal y se liquidaron a los colonos entre agosto 13 y mediados de octubre de 1949.

actuó como representante de éstos al efectuarse la venta de los azúcares a terceras personas. También demostró esa prueba que el 19 por ciento restante de los azúcares producidos, *de no haber habido las tres autorizaciones de las autoridades federales a que hemos aludido* hubiera sido liquidado por la South Porto Rico Sugar Co. al precio promedio para el azúcar crudo en Nueva York durante el período de enero 1º de 1950 a febrero 15 del mismo año, menos gastos de venta y mercadeo. De esto no hay la menor duda. Como de ese 19 por ciento sólo quedó un sobrante de 6.45 por ciento, esos azúcares excedentes fueron liquidados de conformidad con lo que se acaba de exponer. Sobre ese 6.45 por ciento tampoco es necesario resolver si hubo o no una compra por la querellada de las cañas o de los azúcares de los colonos. Tal determinación sólo es requerida en relación con el 12.55 por ciento correspondiente a la totalidad de las tres cuotas adicionales.

El aviso[3] de la South Porto Rico Sugar Co. admitido en evidencia como *Exhibit* 12 no constituye, en manera alguna, un contrato entre ella y los colonos, toda vez que no se desprende que los colonos aceptaran las condiciones en él fijadas, ni que hubiera, por ende, acuerdo entre aquélla y éstos sobre las mismas. Ese aviso meramente demuestra el propósito o intención de la querellada de liquidar el 81 por ciento del azúcar correspondiente al colono al precio mensual del producto puesto en Nueva York, incluyendo costo,

---

[3] El aviso textualmente copiado se lee así:

"SOUTH PORTO RICO SUGAR COMPANY OF PUERTO RICO
Ensenada, Puerto Rico

Marzo 1ro., 1949

AVISO

"De acuerdo con el Artículo 3 (*c*) de la Determinación del Secretario de Agricultura de los Estados Unidos de América, sobre Precios Justos y Razonables para la cosecha de 1948–49 de Puerto Rico, nosotros por ahora tenemos la intención de liquidar el 81 por ciento del azúcar correspondiente al colono, al precio promedio mensual del azúcar puesta en Nueva York, incluyendo costo, seguro y flete.

seguro y flete; y el de retener el 19 por ciento restante hasta principios de marzo de 1950, para ser liquidado al precio promedio correspondiente al período de enero 1º a febrero 15 de 1950 del azúcar puesto en Nueva York. Sin embargo, toda vez que ese aviso dice además que "si hubiese un aumento en la cuota de azúcar vendible durante el corriente año debido a las deficiencias en otras áreas productoras, liquidaremos una parte del excedente proporcional *al precio promedio mensual del azúcar puesta en Nueva York*, incluyendo coste, seguro y flete", es menester determinar el alcance de esas palabras en tanto en cuanto las mismas puedan arrojar alguna luz sobre la cuestión que nos ocupa.

■ No interpretamos ese último párrafo del aviso—ni éste en conjunto—como una compra por parte de la South Porto Rico Sugar Co. a sus colonos de los azúcares correspondientes a las cuotas adicionales. Tampoco como una compra de las cañas que produjeron esos azúcares. Lo interpretamos en el sentido de que el 19 por ciento restante, que podríamos calificar de azúcar en exceso de la cuota básica, sería liquidado al precio promedio prevaleciente durante el período que medió entre el 1º de enero y el 15 de febrero de 1950, para azúcar puesta en Nueva York, incluyendo los referidos gastos; y en el sentido de que de haber un aumento en la cuota original los azúcares correspondientes a tal aumento serían liquidados al precio o precios prevalecientes en el mercado de Nueva York para la fecha en que los mismos

---

"La liquidación del 19 por ciento restante, excedente estimado sobre la cuota de producción asignada a la Isla, será retenida hasta el principio de marzo de 1950, para ser liquidada al precio promedio correspondiente al precio de enero 1ro. a febrero 15, 1950 del azúcar puesta en Nueva York, incluyendo costo, seguro y flete.

"Sin embargo, si hubiese un aumento en la cuota de azúcar vendible durante el corriente año, debido a las deficiencias en otras áreas productoras, liquidaremos una parte del excedente proporcional al precio promedio mensual del azúcar puesta en Nueva York, incluyendo costo, seguro y flete.

Muy atentamente,

(Fdo.) G. MICHEL,
*Supte. de Colonos.*"

fueran vendidos. El aviso dice, como se ha visto, "liqui-
daremos una parte del excedente proporcional al precio pro-
medio mensual del azúcar puesta en Nueva York." En au-
sencia de palabras específicas a ese respecto, la frase "precio
promedio... puesta en Nueva York" no puede significar el
precio del azúcar puesta en Nueva York un número de meses
antes, como tampoco un número de meses después de haberse
vendido. La lógica indica que esa frase debe significar
el precio promedio a que los azúcares de las cuotas adicionales
han sido vendidos, puestos en Nueva York.

Nos reafirman en el anterior criterio las propias actua-
ciones de la querellada. Si su propósito fué comprar las ca-
ñas de los colonos en efectivo, ¿por qué no pagó por éstas
cuando le fueron entregadas? En defecto de pago en efec-
tivo ¿por qué no acreditó en sus libros en favor de los colo-
nos el valor de esas cañas? ¿Por qué al vender los azúcares
de las cuotas adicionales tantos meses después de entregár-
seles las cañas no pagó intereses sobre el valor de éstas, desde
la fecha en que las mismas fueron entregadas hasta que se
hizo la liquidación de los azúcares? Todo ello nos ratifica
en el criterio de que la South Porto Rico Sugar Co. no com-
pró las cañas y de que siempre tuvo en mente liquidar los
azúcares de cuotas adicionales al precio prevaleciente para
la época en que se efectuaran las ventas de los mismos.

■ Por otra parte, los documentos ofrecidos en evi-
dencia por la South Porto Rico Sugar Co., en relación con
contratos celebrados por ella con Alberto Márquez y Ernesto
Quiñones Sambolín, no importa los términos en que estén
redactados ni que los mismos se interpreten en el sentido de
que ella compraba a éstos todas las cañas producidas por
sus fincas, no significan que entre ella y los querellantes ante
la Comisión existieran contratos de idéntica naturaleza. Por
el contrario, la prueba aducida tendió a demostrar una si-
tuación distinta.

Dadas las anteriores consideraciones, llegamos a la con-
clusión de que la South Porto Rico Sugar Co. no adquirió

por compra a los colonos los azúcares correspondientes al 12.55 por ciento de las tres cuotas adicionales, como tampoco las cañas de que tales azúcares se fabricaron; de que dicha South Porto Rico Sugar Co. meramente actuó en cuanto a los referidos azúcares, como agente vendedora de los colonos; y de que, en su consecuencia, debió liquidarles esos azúcares a los precios a que los mismos fueron por ella vendidos, menos los gastos de venta y mercadeo. (4)

*Debe revocarse la sentencia apelada y en su lugar dictarse otra ordenando a la South Porto Rico Sugar Co. liquidar a los colonos los azúcares de las cuotas adicionales en la forma que se acaba de indicar.*

----

(4) En *Pérez* v. *Claudio* y *South P. R. Sugar Co.*, 48 D.P.R. 575, este Tribunal resolvió que un convenio celebrado entre Claudio y dicha compañía, intitulado "Contrato Privado de Compraventa de Cañas" era "más bien que de compraventa, uno de molienda de cañas y refacción." El contrato interpretado en ese caso guarda bastante similitud con la situación envuelta en el presente.